CALAMARI FISHERIES, INC. d/b/a
The Daily Catch, Plaintiff,

v.

THE VILLAGE CATCH, INC. d/b/a The
Village Catch, et al., Defendants.

Civ. A. No. 87–1469–WD.

United States District Court,
D. Massachusetts.

Oct. 24, 1988.

Roberta Fitzsimmons, Ricklefs, Uehlein & Nason, Boston, Mass., for plaintiff.

Harvey A. Schwartz, Schwartz, Shaw & Griffith, Boston, Mass., for defendants.

## ORDER

WOODLOCK, District Judge.

After a hearing upon the defendants' objections to the Report and Recommendation of Magistrate Saris regarding Plaintiff's Motion for Preliminary Injunction and consideration of the submissions of the parties with respect thereto, it is hereby ORDERED:

That until final adjudication on the merits of this matter or further order of this Court, the defendants, their agents, servants, employees and those persons in active concert or participation with them who receive actual notice of this Order, are hereby restrained and enjoined from using the names THE VILLAGE CATCH and VILLAGE CATCH in connection with their restaurant services; and it is FURTHER ORDERED:

That such persons are hereby enjoined and restrained from using the terms CATCH, THE CATCH, CATCHES, THE CATCHES, and CATCH'S as the last word(s) in any two or three word trade name or service mark in connection with their restaurant services; and it is FURTHER ORDERED:

That Defendants shall commence forthwith erection of a different sign or signs for their establishment not using the name

THE VILLAGE CATCH or VILLAGE CATCH and shall commence forthwith destruction or quarantine of all previously prepared business cards and other promotional materials bearing such name, leaving in any place under defendants' custody or control at any time after November 25, 1988 no publicly available indication of their establishment's previous name; and it is FURTHER ORDERED:

That the plaintiff post a bond in the amount of $5,000 as security pursuant to Fed.R.Civ.P. 65(c).

## MEMORANDUM

At issue here is what to do about consumer confusion concerning the use of the name "Catch" to describe a distinctive Sicilian-type seafood restaurant in the Greater Boston area. The matter comes before me on the defendants' objections to Magistrate Saris' Report and Recommendation Regarding Plaintiff's Motion for a Preliminary Injunction issued August 17, 1988.

Upon review of that Report and of the defendants' objections and the plaintiff's response thereto, and after a hearing in this matter, I will adopt the recommendation of the Magistrate substantially for the reasons stated in her Report. Certain editorial modifications, however, have been made in the Magistrate's recommended Order, which will issue as the Court's injunctive decree.

Because the Magistrate's clear and comprehensive Report is in many ways a model for the treatment of these issues and because I find that any further observations by me are unlikely to improve upon the analysis given to the issues in the Report, I incorporate the Magistrate's Report in this Memorandum and direct that the entirety of the Magistrate's Report be published as part of the papers by which I dispose of this motion.

I add only a few comments directed to the objections presented by the defendants.

At this stage in the proceedings, it appears quite likely that plaintiff will prevail on its claim that the principal of the defendant restaurant—a former chef for the plaintiff at its restaurant—has been trading on the plaintiff's reputation through the use of a confusingly similar name and the presentation of a similar menu in a similar ambience.

Although the defendants object that the Magistrate's conclusions with respect to the four branches of preliminary injunction analysis, *see generally Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corporation*, 799 F.2d 6, 12 (1st Cir.1986), are erroneous, the primary objection is to the recommended interim remedy of a name change for the defendants' establishment. The defendants make two points.

First, they assert that the particular restrictions on the use of the word "Catch" in the Magistrate's Order would permit evasions of the spirit of the Order, resulting in the same confusion which gave rise to the restrictive remedy. Second, they assert that a disclaimer in all advertising would be a fully effective but appropriately less severe alternative in this case.

By contrast, the plaintiff, which had originally sought as an interim remedy to prohibit entirely the use of the word "Catch" in the name of defendants' restaurant, does not now object to the less restrictive alternative recommended by the Magistrate. The plaintiff, however, adamantly opposes the use of a disclaimer as now proposed by the defendants.

If I had initially been confronted with the parties' submissions at the hearing stage before the Magistrate, I might well have framed the remedy with both a total prohibition of the word "Catch" in the name of the defendants' restaurant and a direction to provide a disclaimer for a period of time. The process of presenting the matter to the Magistrate has, however, modified and sharpened the parties' views regarding the appropriate interim remedy. They are in the best position to calibrate the relative harms they face. Under these modified circumstances I find the Magistrate's recommendation appropriate.

Presented with a defendant restaurant which makes little use of advertising, and a principal of the restaurant who characterizes the most important aspects of his restaurant's success as involving not its catchy name but rather its "location, decor,

me, [and] seafood," I am satisfied that a carefully tailored name change of the type fashioned by the Magistrate to ameliorate consumer confusion is an appropriate interim remedy. I am suspicious of the defendants' protestations that the standards for the name change recommended by the Magistrate create opportunities for them to evade the spirit of the preliminary injunction decree. Given plaintiff's satisfaction with the Order—despite an awareness of defendants' suggestion of evasive compliance—I decline to restyle the Order recommended.

The defendants' request for a disclaimer is no less questionable than its expressed concern regarding its own evasive compliance. Having considered plaintiff's views as to a disclaimer, I have concluded that the use of a disclaimer here could become a subtle, indirect, and ironic means for the defendants to communicate and reinforce association with the plaintiff. Any disclaimer will appear to some customers to be little more than an attempt to impose a meaningless, hypertechnical legal requirement. By coupling the plaintiff's name with the defendants' establishment through the litotic presentation of the plaintiff's protected name in a disclaimer, defendants will continue to achieve indirectly what they are proscribed even from suggesting directly. The defendants should not be permitted to encourage patrons to enter their own restaurant through a descriptive back door below a sign containing reference to plaintiff's name. *See generally Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1324 (2d Cir.1987).

Report and Recommendation Re: Plaintiff's Motion for Preliminary Injunction (Docket 16)

PATTI B. SARIS, United States Magistrate.

## I. INTRODUCTION

This is an action brought by one seafood restaurant, THE DAILY CATCH, with three locations in Boston and Cambridge, against a competing Brookline seafood restaurant, THE VILLAGE CATCH, which was started and is operated and owned by a chef who had worked at THE DAILY CATCH for three years.

Count I of the Verified Complaint filed on June 9, 1987, alleges that plaintiff has used the service marks THE DAILY CATCH and DAILY CATCH continuously since 1973 to identify its restaurant services specializing in a cuisine of fresh squid, seafood and pasta prepared in a Sicilian style of cooking, and that the marks have acquired secondary meaning causing consumers to associate the marks with plaintiff and its restaurant services. (Docket 1, ¶¶ 16, 40, 49). Plaintiff also claims in Count I that defendants' use of the marks THE VILLAGE CATCH, VILLAGE CATCH, THE CATCH, and THE CATCHES to identify their restaurant services is likely to create confusion in the minds of a substantial number of the restaurant-going public, and indeed has caused instances of actual confusion, in violation of the Lanham Act, 15 U.S.C. § 1125(a). (*Id.*, ¶¶ 25, 50–52).[1]

On September 21, 1987, plaintiff filed a motion for preliminary injunction to enjoin defendants "from using the terms CATCH, THE CATCH, CATCHES, THE CATCHES, CATCH'S and DAILY alone or in combination with other words or symbols or devices as a service mark, trademark, trade name, corporate or other entity name or otherwise to identify, market, advertise, promote, offer to sell, sell or provide restaurant services and from otherwise infringing plaintiff's service marks THE DAILY CATCH and DAILY CATCH." (Docket 16). The motion for preliminary injunction is based solely on Count I of the Verified Complaint.

Plaintiff's motion for preliminary injunction has been referred here for report and

---

1. The remaining counts allege state statutory and common law violations in connection with plaintiff's restaurant services and wholesale business (Counts II–III, VI–VII); trade dress infringement (Count IV); violations of the Lanham Act, 15 U.S.C. § 1125(a), in connection with plaintiff's wholesale business (Count V); and unfair and deceptive practices in violation of Mass.Gen.L. ch. 93A (Count VIII).

recommendation.[2] After an opportunity for discovery, the parties completed the filing of memoranda, supporting affidavits and exhibits in May 1988, and a hearing was held on May 31, 1988. No live testimony was heard. After reviewing the parties' arguments, well-briefed memoranda and ample supporting documentation, the Court RECOMMENDS that plaintiff's motion for preliminary injunction be ALLOWED in part. A recommended order is attached.

## II. FINDINGS OF FACT

### A. *The Daily Catch*

Plaintiff, Calamari Fisheries, Inc. d/b/a The Daily Catch, is owned by Paul R. Freddura and Maria Lombardo Freddura, who are husband and wife. (Docket 18, ¶ 1). They opened the first THE DAILY CATCH restaurant at 323 Hanover Street in the North End section of Boston, Massachusetts in 1973 as a combination retail fish market and restaurant/cafe. (*Id.*, ¶ 2). In the early years, Paul Freddura did the cooking and experimented with Sicilian recipes handed down to him from his mother; he served meals to patrons in the frying pans in which they were cooked. (*Id.*, ¶ 3). In 1980, the restaurant closed down its retail fish market section, and the present menu was adopted which features squid and seafood prepared in a Sicilian style. (*Id.*). The restaurant kept the same exterior and interior decor and continued to serve food to patrons in frying pans. (*Id.*).

The first THE DAILY CATCH restaurant seats approximately 22 people. (*Id.*, ¶ 6). It has a storefront exterior with an overhanging green canvas awning which contains the name THE DAILY CATCH in large white block letters. (*See* Docket 49–50, Ex. 5, # 16). Green-checkered cafe curtains hang in the lower half of the restaurant windows in such a manner that permits the public to view the interior of the restaurant from the street. (*Id.; see also* Docket 18, Ex. 13). One of the windows contains the words "Calamari Cafe" painted in blue script outlined in gold, with a squid design between the two words. (Docket 49–50, Ex. 5, # 16).

The interior of the restaurant is informal, containing cooking facilities and a ceiling pan rack with hanging frying pans which are in full view of restaurant patrons. (Docket 18, ¶ 3 and Ex. 13; *see also* Docket 49–50, Ex. 5, # 18). Menu items are displayed on a blackboard, with "Appetizers" listed on the left, "Entrees" listed on the right, and "The Catch of the Day" listed in the bottom right hand corner. (Docket 18, Ex. 1).

In 1984, the Fredduras opened a second THE DAILY CATCH restaurant on Northern Avenue in Boston, Massachusetts. (*Id.*, ¶ 6). The restaurant seats 44 people. (*Id.*). Like the North End restaurant, it has a storefront exterior with an overhanging green canvas awning containing the name THE DAILY CATCH in large white block letters, and an informal interior decor which includes an open-view kitchen and a blackboard display of the menu. (Docket 49–50, Ex. 5, # 19–21). The restaurant does not have any curtains hanging in the windows. (*Id.*, # 19).

On August 3, 1987, the Fredduras opened a third THE DAILY CATCH restaurant at One Kendall Square, Cambridge, Massachusetts. (Docket 18, ¶ 7). This third restaurant was designed as the Fredduras' "flagship and prototype for franchising and/or multi-unit licensing purposes," and represents their first venture to operate THE DAILY CATCH restaurant outside of Boston proper and to enter into the take-out and fast-food markets. (*Id.*, ¶¶ 8–9). The main floor of the third THE DAILY CATCH houses the restaurant which seats 144 persons; the lower level houses a retail fish and pasta shop called "The Black Pasta Shoppe," a cafe, and a take-out section offering a selection of squid, pastas and Sicilian sauces "to go." (*Id.*, ¶ 9).

The third THE DAILY CATCH looks different from the first two restaurants. It is

---

**2.** Plaintiff also has filed a motion to dismiss defendants' counterclaims, which has been referred here for report and recommendation. (*See* Docket 8). The Court will issue a recommendation on this motion later in a separate opinion.

a much larger complex, and has a modern design. It does not have the storefront exterior or overhanging green canvas awning which form the exterior decor of the first two restaurants. The name of the restaurant is instead located over a pedestal entrance in blue block letters, with the first term "The" given lesser emphasis by being written in smaller lower-case letters. (Docket 49–50, Ex. 5, # 11). Moreover, the interior decor is "far more elegant" than that of the other DAILY. CATCH locations, with "blue-gray carpeted floors ... bordered by wide corridors of white tile," "classy padded chairs," and marble tables. (Docket 63, Ex. 15, "*Boston Phoenix* January 1988" article, and *Boston Herald* article, dated September 25, 1987; *see also* Docket 49–50, Ex. 5, # 13–15). There is a large separate bar area not found in the other two restaurants, and it appears from photographs that meals are served on china plates rather than in frying pans. (Docket 49–50, Ex. 5, # 13–15). The third restaurant does, however, retain the open-view kitchen of the other THE DAILY CATCH restaurants where patrons can watch their meals being prepared. (Docket 63, Ex. 15, "*Boston Herald,* Friday, September 25, 1987" and "*Boston Globe*—A Matter of Taste" articles).

In an affidavit submitted in support of the preliminary injunction motion, Maria Freddura states that "[w]e plan to open the fourth THE DAILY CATCH restaurant, together with several other investors, in Old Town, Alexandria, Virginia in the fall of 1987"; this restaurant is based on the third THE DAILY CATCH prototype and is designed to seat 50 people. (Docket 18, ¶ 10). There is no evidence in the record that the restaurant has opened as planned.

The 18 core menu items of THE DAILY CATCH restaurants for which plaintiff claims its recipes are "unique," offered at THE DAILY CATCH on a regular (usually daily) basis from February 1982 through May 1985, were as follows:

*APPETIZERS:* Fried Calamari (small and large); Marinated Calamari Salad; Fried Stuffed Calamari; Calamari Meatballs; Littlenecks Siciliano; Sicilian Style Mussels; Calamari Scampi; and Shrimp Scampi.

*ENTREES:* Calamari and Linguine (red or white sauce); Clams and Linguine (red or white sauce); Shrimp and Linguine (red or white sauce); Vongole Neapolitan; Stuffed Calamari; Mussels Marinara; Sauteed Calamari Vinaigrette; Calamari Platter; Monkfish Marsala; and Lobster Fra Diavolo.

(Docket 63, Ex. 23).[3] THE DAILY CATCH has also become known for its "black pasta"—pasta blackened with squid ink—and does serve additional seafood dishes, which are not on the core menu, as "specials." These specials have included various kinds of grilled or broiled fish; fish and chips; Shrimp Marsala; Marinated Swordfish Pieces; and Marinated Tuna Chunks. (*See* Docket 63, ¶ 13). The restaurants do not serve any mesquite-grilled fish or any beef or chicken dishes.

THE DAILY CATCH restaurants have been extremely successful. They have received numerous favorable reviews in the Boston-area press, particularly for their calamari (squid) dishes and "black pasta." (*See* Docket 18, Ex. 2; Docket 63, Ex. 15). The television media also favorably covered THE DAILY CATCH on Channel 5's TV journal program "Lifestyle" in 1979 and on Channel 4's "Evening Magazine" in 1985. (Docket 18, ¶ 5). THE DAILY CATCH received the "Creme de la Creme Award" from *Boston's Best Guide* in 1985 for outstanding performance in calamari dishes; the "1981 Best of Boston" award from *Boston Magazine* for "best inexpensive seafood"; and *Boston Magazine*'s recognition as one of the outstanding restaurants featured in its 1983 and 1984 Summer/Fall Dining Guides. (Docket 1, Ex. 4). Accord-

---

3. Relying on Plaintiff's Further Answer to Interrogatory No. 7 propounded by The Village Catch, Inc., defendants claim that plaintiff alleges only that its Marinated Calamari Salad, Calamari Meatballs, and Stuffed Calamari are "unique" to its restaurants. (Docket 46, pg. 15). However, in its answer, plaintiff interpreted the question to refer to its wholesale business, as opposed to its restaurant services. (*Id.*, Ex. 8, Interrogatory No. 7).

ing to a "Readers Poll" conducted annually by the *Boston Globe*, THE DAILY CATCH was rated the third most popular seafood restaurant in the Boston area for the year 1987. (Docket 63, Ex. 20). Also, according to the 1988 Zagat Boston Restaurant Survey of over 400 restaurants in the Boston area, THE DAILY CATCH was rated # 21 as a top seafood restaurant and # 22 as a top southern Italian restaurant. (Docket 63, Ex. 22).

Advertisements for THE DAILY CATCH restaurants are published regularly in various Boston-area newspapers and magazines, such as the *Boston Magazine*, *Boston's Best Guide*, the *Boston Phoenix*, and *Fine Dining*. (Docket 18, ¶ 23 and Ex. 12). The Fredduras are spending substantial sums of money to advertise the third THE DAILY CATCH restaurant in Cambridge; Maria Freddura states that they are spending "almost as much money as we have spent in total over the past 13 years to advertise THE DAILY CATCH I and II restaurants." (*Id.*, ¶ 23).

An application dated January 19, 1987 was submitted by plaintiff Calamari for registration of the mark THE DAILY CATCH. (Docket 1, Ex. 6). Certificate of Registration No. 1455893 was issued on September 1, 1987 by the Commissioner of Patents and Trademarks to Calamari for the use of the mark THE DAILY CATCH for restaurant services. (Docket 63, Ex. 14). In its usage of the words DAILY and CATCH as a service mark in connection with its restaurant services, plaintiff uses the words THE DAILY CATCH and DAILY CATCH in combination, and *not* the word CATCH alone. (Docket 46, Ex. 7, Interrogatory No. 3).

### B. *The Village Catch*

Defendant Gregory Jacobs ("Jacobs") worked as a chef for the first THE DAILY CATCH restaurant in the North End section of Boston from approximately May 1982 to May 1985, when he resigned. (Docket 18, ¶ 11; Docket 46, Ex. 2, ¶ 5). Prior to that, he was assistant chef at a

Legal Seafoods restaurant from January 1980 to May 1981. (Docket 46, Ex. 2, ¶ 4).

Shortly after he left THE DAILY CATCH, Jacobs told defendant Richard Morse ("Morse") that he planned to open a seafood restaurant in Brookline, Massachusetts because there were no other fresh fish restaurants in that area, and that he was considering a particular location in the Brookline Village area. (*Id.*, Ex. 3, ¶ 5). The Village Catch, Inc. was organized by Jacobs three months after he resigned in August 1985.[4] At that time, Jacobs had already entered a lease to operate a restaurant at 20–22 Harvard Street in Brookline Village. (*Id.*, Ex. 2, ¶ 6). In January 1986, the restaurant opened under the name THE VILLAGE CATCH. (*Id.*, Ex. 3, ¶ 5).

Jacobs states in his affidavit submitted in opposition to the preliminary injunction motion that he chose the name THE VILLAGE CATCH because "it incorporated both its location (Brookline Village) and that fresh fish was served." (*Id.*, Ex. 2, ¶ 7). He testified in his deposition that he considered naming the restaurant "Village Seafoods," but rejected that name because "it wasn't catchy" and "didn't have any pizazz." (Docket 64, Ex. A, pg. 108). He also testified that he chose the word "catch" because "usually you can associate with fresh seafood, today's catch. It makes people think." (*Id.*, pg. 167).

In deciding upon the name THE VILLAGE CATCH, Jacobs said he looked through the telephone book to get ideas and noticed there were other restaurants that used the word "catch." (*Id.*, pg. 109). Defendants claim that other restaurants or seafood businesses which use the words "Daily" or "Catch" in their names include: "The Daily Ketch," 815 Ocean Street, Marshfield, Massachusetts; "The Daily Fish Market," 2249 Washington Street, Roxbury, Massachusetts; "Catch Enterprise," 11 Roxbury Street, Roxbury, Massachusetts; "JP's Catch," 1300 Wilbur Avenue, Somerset, Massachusetts; "Carey's Catch," 46 Massachusetts Avenue, Lexington, Massachusetts; "Catch of the Day,"

---

**4.** Defendant Morse is the president, defendant Melvin Jacobs is the treasurer and defendant

Wendy S. Travers is the clerk of the Village Catch, Inc. (*See* Docket 7, ¶¶ 7–9).

19 Leonard Street, Belmont, Massachusetts; "The Fresh Catch," 30 Chauncy Street, Mansfield, Massachusetts; "The Captain's Catch," 10 Maple Street, Danvers, Massachusetts; "Days Catch Seafood," 1020 South Street, Pittsfield, Massachusetts; and "Mountain Seafood Day's Catch," Pittsfield, Massachusetts. (*See* Docket 46, pg. 6 and Ex. 8, Amended Interrogatory No. 11).

THE VILLAGE CATCH restaurant is similar in exterior and interior decor to the first two THE DAILY CATCH restaurants. A number of the presently existing conditions and fixtures were present on the premises, previously leased to a bakery, before THE VILLAGE CATCH took possession of the property. (Docket 46, Ex. 1, ¶ 2). The walls, ceilings, plank flooring and storefront exterior are the same as they were before THE VILLAGE CATCH took possession of the property; also, the tables, chairs and refrigeration units presently used by THE VILLAGE CATCH were used by the bakery and left on the premises when THE VILLAGE CATCH took possession. (*Id.*, ¶¶ 3–4).

THE VILLAGE CATCH is around the same size as the first two DAILY CATCH restaurants, seating approximately 30 people. (Docket 64, Ex. A, pg. 133). There is no awning over the entrance to the restaurant. The name VILLAGE CATCH is instead written above the windows on two wood planks in large red script letters outlined in white; a white scallop shell design is placed at the beginning and end of the name. (Docket 49–50, Ex. 5, #3, 5, 8). Red-checkered cafe curtains hang in the lower half of the restaurant windows in the same fashion as the first THE DAILY CATCH restaurant so that the public can view the interior of the restaurant from the street. (*Id.*). Two of the window panels contain the words "Seafood & Pasta," one window panel contains the words "Mesquite Grilled," and a fourth window panel contains the words "Fresh Seafood" painted in red script letters outlined in white. (*Id.*).

Initially, there was a sign in the restaurant window which stated that owner-chef Gregory Jacobs was "formerly of THE DAILY CATCH."[5] On March 4, 1986, Robert Nadeau of the *Boston Phoenix* wrote a restaurant review entitled "VILLAGE CATCH—HAIL THE CALAMARI KING" which began as follows:

> The hand-lettered sign says that Chef Greg, formerly of the DAILY CATCH is KING OF CALAMARI AND MASTER OF MESQUITE. To judge from the evidence on my plate, every word is true. The general set-up and the emphasis on squid dishes come from the fabulous Daily Catch restaurants in the North End and on Northern Avenue. But skillful mesquite grilling adds a whole "nother dimension."

(Docket 18, Ex. 6, *Boston Phoenix* article, dated March 4, 1986; *see also* Docket 64, Ex. A, pg. 120).

THE VILLAGE CATCH also has an informal interior which is similar to that of the first two THE DAILY CATCH restaurants, including cooking facilities and a ceiling pan rack with hanging frying pans which are in full view of restaurant patrons. (Docket 49–50, Ex. 5, #1, 2, 4, 9). As in the first two THE DAILY CATCH restaurants, meals at THE VILLAGE CATCH are served in frying pans and menu items are displayed on a blackboard with "Appetizers" listed on the left and "Entrees" listed on the right. (Docket 18, Ex. 13; Docket 49–50, Ex. 5, #7). Jacobs states in his affidavit that THE VILLAGE CATCH uses a blackboard to avoid the cost of printed menus; to add atmosphere to the restaurant; and to allow for flexibility in adding, deleting or changing menu items on the basis of market availability. (Docket 46, Ex. 2, ¶ 12). Jacobs further states that two other seafood restaurants in the Boston area—Legal Seafoods and Skipjacks—use blackboards, "probably for the same reasons." (*Id.*).

---

**5.** Defendants' counsel stated this at the hearing on the preliminary injunction motion held on May 31, 1988.

THE VILLAGE CATCH does not serve any beef or chicken dishes. (Docket 64, Ex. A, pg. 149). Since the restaurant opened in 1986, approximately 57 seafood items have been offered on the menu. (Docket 46, Ex. 2, ¶¶ 8, 11). Fourteen of the 57 items served at THE VILLAGE CATCH are also claimed by THE DAILY CATCH to be on its list of 18 core menu items which are "unique" to its restaurant services; they are as follows:

*APPETIZERS:* Fried Calamari; Calamari Scampi; Marinated Calamari Salad; Shrimp Scampi; Littlenecks Siciliano; and Sicilian Style Mussels.

*ENTREES:* Calamari and Linguine (red or white sauce); Clams and Linguine (red or white sauce); Shrimp and Linguine (red or white sauce); Vongole Neapolitan; Mussels Marinara; Monkfish Marsala; Sauteed Calamari Vinaigrette; and Lobster Fra Diavolo.

(*See* Docket 46, Ex. 2, attachment A; Docket 63, Ex. 23). Other seafood items which both THE VILLAGE CATCH and THE DAILY CATCH have served their customers are: Littlenecks on the ½ shell; Cherrystones on the ½ shell; fish and chips; Shrimp Marsala; Marinated Swordfish Pieces; Grilled Mahi Mahi; Broiled Salmon; Broiled Bluefish; Grilled Halibut; Broiled Tuna; Grilled Tuna; Grilled Mackeral; Broiled Mackeral; Broiled Sole; Grilled Sole; and Marinated Tuna Chunks. (*See* Docket 46, Ex. 2, attachment A; Docket 63, ¶ 13).

THE VILLAGE CATCH does, however, serve certain seafood items which are *not* offered by THE DAILY CATCH. Most significantly, THE VILLAGE CATCH offers various types of mesquite-grilled fish. It has also served the following items which have not been offered at THE DAILY CATCH: Fried Shrimp; Scallop Scampi; Littlenecks Roberto; Scallop Marsala; Shrimp Piccata; Scallop Piccata; Monkfish Piccata; Grilled Marinated Squid; and various pompano, crab, and trout dishes. (*Id.*).

Moreover, THE VILLAGE CATCH does not have certain items on its menu which *are* offered by THE DAILY CATCH. In particular, "black pasta" and various DAILY CATCH calamari dishes—including the Calamari Meatballs, Fried Stuffed Calamari, Stuffed Calamari with Linguine, and Calamari Platter—are not served at THE VILLAGE CATCH. (Docket 46, Ex. 2, attachment A).

THE VILLAGE CATCH has received favorable reviews from the Boston-area media, including the *Boston Phoenix, Boston Globe* and *Boston Herald.* (Docket 18, Ex. 6). Like THE DAILY CATCH, THE VILLAGE CATCH was rated # 21 as a top seafood restaurant and # 22 as a top southern Italian restaurant in the 1988 Zagat Boston Restaurant Survey of over 400 restaurants in the Boston area. (Docket 63, Ex. 22).

In most of the articles written on THE VILLAGE CATCH, the similarities between THE VILLAGE CATCH and THE DAILY CATCH were noted. (*See* Docket 18, Ex. 6; Docket 63, Ex. 19). For example, in a *"Boston Globe*—Matter of Taste" article, it was stated that THE VILLAGE CATCH offered a "tasty menu reminiscent of the two Daily Catch restaurants in Boston's North End and waterfront." (*Id.*). In the *Boston Herald*'s list of the "Hub's top 10 spots for seafood," dated February 23, 1988, THE VILLAGE CATCH was described as follows: "Chef-owner Greg Jacobs took Daily Catch's cooking-as-entertainment idea and has attracted the same long lines for fresh fish and pasta in red sauce, with calamari as 'the main attraction.' " (Docket 63, Ex. 19). Another *Boston Herald* article, dated August 30, 1987, provided:

[T]he Daily Catch has produced at least one downright imitator. The Fredduras have sued The Village Catch for confusing its customers by its similar name. And the name isn't all that's similar. From the monkfish marsala on the menu to saute pans on the tables, the Village Catch is an almost total ripoff of the Daily Catch, where owner Gregory Jacobs once cooked.

(Docket 18, Ex. 11).

Some of the articles have also noted differences between the two restaurants, such as THE VILLAGE CATCH's expansion of

the menu to include mesquite-grilled seafood and failure to include "black pasta" dishes on its menu. (*Id.*, Ex. 6, *Boston Phoenix* article, dated March 4, 1986, and "*Boston Globe*—A Matter of Taste" article).

THE VILLAGE CATCH has not expended much money or effort in advertising. Jacobs testified in his deposition that he "wouldn't pay that much for advertising," and that he most likely spent under $500 in the years 1986 and 1987 on advertising or promotion for the restaurant. (Docket 64, Ex. A, pgs. 126–27).[6] Initial advertisements were placed in the *Brookline Tab* newspaper, but no advertisements were publicized in the major newspapers or on television. (Docket 46, Ex. 2, ¶ 19; Ex. 3, ¶ 18). An ad was placed in the *Boston Phoenix.* (Docket 18, ¶ 13).[7] This ad read as follows: "The VILLAGE CATCH'S on—featuring 'The King of Calamari'—The Master of Mesquite—Greg—formerly of the Daily Catch—now preparing your requests." (*Id.*, Ex. 7; *see also* Docket 64, Ex. A, pg. 121). The advertisement included a picture of the restaurant's storefront exterior with checkered cafe curtains. The business card for THE VILLAGE CATCH similarly emphasized the storefront exterior and checkered curtains. (Docket 18, Ex. 10A).

Jacobs testified in his deposition that approximately 2% of THE VILLAGE CATCH's patrons are from THE DAILY CATCH. (Docket 64, Ex. A, pg. 136). He stated that he did not need to spend much money advertising the restaurant because people found out about it by "word of mouth" and were drawn to the "location, decor, me, seafood." (*Id.*, pgs. 136–37).

Subsequent to the filing of this lawsuit, Jacobs opened a second restaurant in Brookline Village called THE VILLAGE SMOKEHOUSE. (Docket 18, ¶ 24). This restaurant serves "TexMex" food and is not competitive with THE DAILY CATCH. (*Id.*).[8] However, the restaurant is similar to THE VILLAGE CATCH in exterior and interior decor. (*Id.; see also* Docket 63, Ex. 25).

### C. *Consumer Confusion*

Plaintiff has offered the following evidence of the public's confusion over THE VILLAGE CATCH and THE DAILY CATCH restaurants. In an article in the *Nation's Restaurant News*, dated January 12, 1987, defendant Morse was described as the owner of THE DAILY CATCH, "with small sites on Hanover Street and Northern Avenue on the pier, [who] last year spawned the Village Catch in Brookline Village." (Docket 18, Ex. 8). Moreover, Maria Freddura has stated in an affidavit that following the opening of THE VILLAGE CATCH restaurant in January 1986, the staff at the first two THE DAILY CATCH restaurants reported receiving phone requests for directions to "our new Brookline restaurant," and comments from patrons who stated that they had been to "our Brookline restaurant." (*Id.*, ¶ 16).

Five affidavits have been filed by persons who believed THE VILLAGE CATCH was a branch of THE DAILY CATCH during the time period from January 1986 through July 1987. Mark A. Selig, a resident of Brookline, stated that he patronized THE VILLAGE CATCH approximately five times beginning in the spring of 1986, and on each of these occasions believed the restaurant was a satellite branch of THE DAILY CATCH. (Docket 55, ¶ 3). He stated that the word CATCH was the main cause for his belief that THE VILLAGE CATCH was an offshoot of the North End DAILY CATCH, as well as the fact that THE VILLAGE CATCH had the same "come-as-you-are" atmosphere as the North End DAILY CATCH. (*Id.*, ¶ 4).

---

**6.** Jacobs did spend approximately $500 in the first quarter of 1988 for advertising the opening of a fish market named "SeaFoods Unlimited" at 24 Harvard Avenue. (*Id.*, pgs. 127–28).

**7.** Jacobs' affidavit incorrectly states that no advertisement was placed in a newspaper other than the *Tab.* (Docket 46, Ex. 2, ¶ 19).

**8.** Plaintiff's speculation that there will be consumer confusion between THE DAILY CATCH and THE VILLAGE SMOKEHOUSE has no support in the record.

Fern Nesson, a resident of Cambridge, stated that when she patronized THE VILLAGE CATCH in July 1987, she believed the restaurant was a branch of THE DAILY CATCH based on the similarity of the names, the open-view kitchen and the use of frying pans to serve the meals. (Docket 56, ¶¶ 3, 5). Lisa Kirschner, a Brookline resident who patronized THE VILLAGE CATCH on one occasion in January or February 1987, stated she too believed that THE VILLAGE CATCH was a branch of THE DAILY CATCH. (Docket 57, ¶ 3). She said: "One of the reasons for my confusion was the name.... I assumed that the owners of THE DAILY CATCH restaurant used the word VILLAGE for the Brookline restaurant because the restaurant was in Brookline Village." (*Id.*, ¶ 4). Ms. Kirschner also observed the physical similarities between the two restaurants— i.e., their exteriors, the open-view kitchen with pots and pans hanging from the ceiling, and the use of a blackboard menu and frying pans for serving meals. (*Id.*, ¶¶ 5–6).

In addition, Michael Norkus, a resident of Brookline, stated that he believed THE VILLAGE CATCH to be a DAILY CATCH restaurant until he learned otherwise in August 1987. (Docket 58, ¶¶ 3, 6). He stated that the "use of the word CATCH in the name was the primary reason for [his] belief," as well as the similarity in the "type of food served and the way the dishes looked." (*Id.*, ¶ 4). Karen Brennan, a Boston resident, said that when she patronized THE VILLAGE CATCH in January or February 1987, she "firmly believed that THE VILLAGE CATCH restaurant was owned by the same person who owned THE DAILY CATCH restaurants." (Docket 59, ¶ 3). The reason for her belief was the restaurant name and the decor. (*Id.*, ¶ 4).

Other persons who reported to plaintiff that they had eaten at THE VILLAGE CATCH believing it to be affiliated with THE DAILY CATCH, during the period from January 1986 through July 1987 were: Ann Charette of Needham, Massachusetts; Theresa O'Hara of the Massachusetts Division of Marine Fisheries in Boston; Richard Baeker of Cambridge, Massachusetts; Gerald Hall of Boston, Massachusetts; Mrs. Tolen of Renselaer, New York; David DiRocco of Newton, Massachusetts; Rick Cigliano, a coca-cola supplier; Judy Weiner of *Greater Boston Magazine*, Cambridge, Massachusetts; and Edmund Stevens, Jr. of Lincoln, Massachusetts. (Docket 46, Ex. 7, Interrogatory No. 16).

After the third THE DAILY CATCH restaurant opened in Cambridge on August 3, 1987, there were more frequent instances of consumer confusion. (Docket 18, ¶ 18). In the six and one-half week period after the Cambridge restaurant's opening, an average of six parties a day informed Maria Freddura, who was hostess at the restaurant, that they had been to "our restaurant in Brookline." (*Id.*, ¶ 20). In that same six and one-half week period, waitresses at the Cambridge restaurant reported to Mrs. Freddura approximately 60 or more instances of confusion, where patrons asked questions like "Is Greg [or Jacobs] here?"; "Do you serve food in pans like they do in Brookline?"; "This place looks so different from the one in Brookline"; and "Are you affiliated with THE VILLAGE CATCH?" (*Id.*, ¶ 21). The bartender at the Cambridge DAILY CATCH also reported that during this period he received five or six telephone inquiries a week asking, "Is this THE VILLAGE CATCH?" (*Id.*, ¶ 22). Mrs. Freddura estimates that approximately 10% of the parties who have patronized THE DAILY CATCH in Cambridge to date have included an individual in the group who believed THE VILLAGE CATCH restaurant was owned by or affiliated with THE DAILY CATCH or that the Cambridge DAILY CATCH was owned by THE VILLAGE CATCH. (*Id.*, ¶ 23).

Richard P. Rourke, Director of Sales and Marketing for plaintiff, has filed an affidavit about a specific incident of confusion which occurred on or about the evening of March 30, 1988, when he was filling in as maitre d' at the Cambridge DAILY CATCH. (Docket 60, ¶¶ 1–2). At about 6:30 p.m., two men and a woman arrived at the restaurant who said they were waiting

for a second woman to join them. (*Id.*, ¶ 3). At about 8:15 p.m., the party received a phone call; when Rourke subsequently approached the group to ask them if they had heard from their friend, they told him that they had and that she had been waiting for them at the wrong restaurant. (*Id.*, ¶ 4). Rourke asked them which restaurant she was waiting at, and they told him THE VILLAGE CATCH. (*Id.*).

In addition, the following persons reported to plaintiff that they had eaten at THE VILLAGE CATCH believing it to be THE DAILY CATCH, or thought THE VILLAGE CATCH was owned by, affiliated with, or sponsored by THE DAILY CATCH, during the period of time after THE DAILY CATCH in Cambridge opened: Richard Saltzberg of Cambridge, Massachusetts; Noreen Bolan of Belmont, Massachusetts; Patty O'Hearn of Brookline, Massachusetts; Cindy Franco of Malden, Massachusetts; Andrea and Michael Norbus of Alliance Consulting Company, Cambridge, Massachusetts; Regina Miele of Charlestown, Massachusetts; Linda Lee of Cambridge, Massachusetts; and Michael Goodman. (Docket 46, Ex. 7, Interrogatory No. 16). This list also included Lisa Kirschner, Karen Brennan and Fern Nesson. (*Id.*).

Defendants Jacobs and Morse concede that when they first opened THE VILLAGE CATCH in January 1986, a few customers asked if the restaurant was affiliated with THE DAILY CATCH. (See Docket 46, Ex. 2, ¶ 25; Ex. 3, ¶ 24). Jacobs testified in his deposition that the reason these customers asked this question is because they had seen him cooking at THE DAILY CATCH. (Docket 64, Ex. A, pg. 139). Jacobs avers that on "every occasion this occurred I carefully explained that the two restaurants are not affiliated in any way"; he also states that "[a]ny confusion that might have existed seems to have disappeared since it has been over a year since any one has even suggested that the two restaurants are affiliated." (Docket 46, Ex. 2, ¶ 25).

## III. CONCLUSIONS OF LAW

Plaintiff, as the moving party seeking a preliminary injunction, must meet four criteria before the injunction can issue. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987).

The Lanham Act requires a liberal interpretation of the irreparable injury factor, and there is considerable authority for the view that the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on plaintiff's reputation. *Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 14 (1st Cir.1986) ("*Camel Hair*").

Recognizing that, particularly in actions arising out of the Lanham Act, "[t]he heart of this test is the second and third steps, which present the question whether the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants," the Court now turns to an examination of the four criteria in the context of the facts of this case. *Vargas–Figueroa v. Saldana,* 826 F.2d at 162.

### A. Likelihood of Success on the Merits

15 U.S.C. § 1125(a) provides in relevant part that:

> [a]ny person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be

damaged by the use of any such false description or representation.

The basis for an action under this section is use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the origin of the goods or services. *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977).

 Under this section, plaintiff is required to prove the following three elements to succeed in an infringement suit: (1) the ownership of a distinctive mark entitled to trademark protection; (2) the use of that name in interstate commerce; and (3) its use by another in a manner likely to cause confusion as to the origin of the goods or services. *Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.*, 561 F.Supp. 1014, 1019 (D.R.I.1983) (Selya, J.) (*"Railroad Salvage"*). Here, defendants do not challenge plaintiff's contention that its use of the name THE DAILY CATCH is in interstate commerce, but rather argue that plaintiff has not shown ownership of a protected mark and a likelihood of confusion. (*See* Docket 46, pgs. 1–2). The Court will address each of these arguments separately below.

### 1. *Ownership of Protected Mark*

Plaintiff is requesting that defendants be enjoined from using the word CATCH as a service mark in connection with their restaurant business. (Docket 17, pg. 10).[9] Plaintiff has explained that it "is not attempting to lock up the word 'catch' and prevent competitors from using it to describe restaurant services. Rather, plaintiff is attempting to protect a particular three-word mark THE DAILY CATCH and its variant DAILY CATCH against another three-word mark THE VILLAGE CATCH and its variant VILLAGE CATCH which ... is confusingly similar to plaintiff's mark as applied to restaurant services." (Docket 54, pg. 3).

As a preliminary matter, plaintiff alleges that THE DAILY CATCH is a service mark entitled to protection under the Lanham Act. The Lanham Act defines "service mark" as a "mark used in the sale or advertising of services to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. A service mark can be a word, name or symbol used in the sale or advertising of services of one person to distinguish them from services of others. *West & Co., Inc. v. Arica Institute, Inc.*, 557 F.2d 338, 340 n. 1 (2d Cir.1977).[10] The term "mark" includes any service mark entitled to registration "whether registered or not." 15 U.S.C. § 1127. A service mark holder's right to exclusive use of the mark does not generally arise from registration. Rather, the right, which accrues from the use of a particular name or symbol, is essentially a common law property right. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir.1980) (*"Keebler"*).

Whether a particular service mark is entitled to legal protection depends on whether it is classified, in ascending order of eligibility for protection, as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary and fanciful. *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir.1979); *see also General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987).

 Terms classified as "generic" are those which refer to a genus of which a particular product is a species, without distinguishing its source or origin. *Id.* Generic terms are normally not entitled to service mark protection. *Id.; see also Trak Inc. v. Benner Ski KG*, 475 F.Supp. 1076, 1078 (D.Mass.1979).

 A "descriptive" mark is one which portrays a characteristic of the article or

---

9. At the hearing held on May 31, 1988, plaintiff's counsel stated that plaintiff is primarily concerned with the use of the word CATCH by defendants and is not now pressing its claim regarding the use of the word DAILY.

10. A "trademark" is similar but is used to identify goods or products. Both are governed by identical standards. *Id.* A "trade name," on the other hand, is not registrable. *Railroad Salvage*, 561 F.Supp. at 1018 n. 9.

service to which it refers. *Railroad Salvage*, 561 F.Supp. at 1020; *see also Keebler*, 624 F.2d at 374 n. 8. "Under this paradigm, a name must clearly denote what goods or services are provided in such a way that the consumer does not have to exercise powers of perception or imagination." *Railroad Salvage*, 561 F.Supp. at 1020. One example of a descriptive mark is the term "vision center" used in reference to a place where one purchases eyeglasses. *Id.* Such a mark is entitled to protection under the Lanham Act only upon a showing of secondary meaning, so that the consumer associates the mark with a particular person's goods or services. *Keebler*, 624 F.2d at 374 n. 8. Under this formulation, descriptive marks are "narrowly circumscribed" in their legal protection and registrability and are usually enforced only against closely similar marks which are used on virtually identical products. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984) (*"Pizzeria Uno"*).

■ "Suggestive" marks, on the other hand, connote rather than describe a particular product or service and require the consumer's imagination to reach a conclusion as to the nature of the product or service. *Keebler*, 624 F.2d at 374 n. 8; *see also Railroad Salvage*, 561 F.Supp. at 1020. Such marks can be protected without proof of secondary meaning. *Id.*

■ Finally, "arbitrary" or "fanciful" marks are inherently distinctive and bear no logical or suggestive relation to the actual characteristics of the goods or services. These marks are almost always protectible since, unlike suggestive terms, they are not vulnerable to attack for being merely descriptive. *Keebler*, 624 F.2d at 374 n. 8. This classification need not be discussed at length here, however, as plaintiff has not argued that THE DAILY CATCH falls in this category.

Here, plaintiff applied for registration of the mark THE DAILY CATCH on January 19, 1987, one year after THE VILLAGE CATCH opened. A certificate of registration was issued on September 1, 1987, after this suit commenced. Under the Lanham Act, such registration is "prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration." 15 U.S.C. § 1115(a). This means that at trial the burden of proof will shift from plaintiff, which in a common law infringement action would have to establish its right to exclusive use, to defendants, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such use. *Keebler*, 624 F.2d at 373. The presumption may be overcome by proof that the registered mark is generic or merely descriptive without secondary meaning. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir.1986).

■ Defendants argue that the word CATCH is an unprotectible generic term commonly used to describe fish or seafood. According to one dictionary, the noun "catch" has nine different meanings. One meaning is "that which is caught, including a quantity of fish." The word is also defined as "anything that catches, ... as a latch on a door"; "a slight momentary break or crack in the voice"; "a person or thing worth getting"; "any tricky or concealed drawback"; or "a game in which a ball is thrown from one person to another." *See The Random House College Dictionary* (rev. ed. 1980). Defendants cite *Webster's Third New International Dictionary of the English Language Unabridged* (1968), which defines "catch" as "the act of catching fish" and "the person or thing caught."

The Court concludes that the use of the word "catch" in connection with restaurant services is not generic because it does not simply refer to a kind of service, but rather describes a characteristic of the service. Indeed, Jacobs' own words demonstrate why he rejected one proposed name, "Village Seafoods," for the "catchier"—the pun is his—name, THE VILLAGE CATCH:

Q: I would like you to look at your affidavit again, paragraph 7, "In the custom and usage of the trade, the term 'catch' means fresh seafood."

A: Right.

Q: That's what you said. And my question to you is: What's the basis of that statement? Why did you make that statement?

A: Because whenever you go in a restaurant and think of getting fish, you ask them, what is the catch of the day, and they will tell you.

Q: Okay. That's why you chose the word "catch"?

A: That's one of the reasons usually you can associate with fresh seafood. Today's catch. It makes people think.

(Docket 64, Ex. A, pg. 167). Jacobs also testified he rejected the name "Village Seafoods" because it lacked "pizzaz." (*Id.*, pg. 108). *Contrast S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d at 696 (the term "mart" is generic since it is another word for store or market and no showing was made that the term has any meaning in the minds of the consuming public other than store or market); *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 8–9 (1st Cir.1981) (the word "Lite" is the generic term among consumers of beer for "beer of low caloric content").

The difficult question is whether the term CATCH is merely descriptive, as defendants urge, or whether it is "suggestive" and thus entitled to protection under the Lanham Act without proof of secondary meaning. The line between descriptive and suggestive terms is often blurred, and the categorization of a name as "descriptive" or "suggestive" is frequently "made on an intuitive basis rather than as a result of a logical analysis susceptible of articulation." *Pizzeria Uno*, 747 F.2d at 1528, quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *see also Railroad Salvage*, 561 F.Supp. at 1020.

Here, defendants point to the fact that several other restaurants and seafood businesses in Massachusetts have used the word CATCH in their names. (Docket 46, pg. 6). In determining whether a particular word has a descriptive or suggestive significance as applied to a field of merchandise or service, it is proper to take notice of the extent to which it has been used in trademarks by others in the same field. *Pizzeria Uno*, 747 F.2d at 1531; *see also General Mills, Inc. v. Kellogg Co.*, 824 F.2d at 626–27 ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection").

Given the evidence of third party usage here, the Court concludes that the word CATCH when used in connection with restaurant services is "descriptive," as opposed to "suggestive," of such services—portraying to the consuming public, without invoking their imagination, that the restaurant serves seafood. Contrary to plaintiff's assertion, the use of the word "catch" in connection with restaurant services does not require a customer to use much, if any imagination, to reach a conclusion that the restaurant serves seafood.

Nevertheless, the Court further concludes that plaintiff has shown it is likely to succeed on the merits in establishing that its registered three-word mark THE DAILY CATCH has acquired a secondary meaning in Boston, and the city's surrounding area.

"Secondary meaning is the bridge comprising the consumer's association between the trade name and the single provider of the product or service." *Railroad Salvage*, 561 F.Supp. at 1021 n. 11. Secondary meaning can be established by evidence of: (1) long and exclusive use; (2) size and prominence of the plaintiff's enterprise; (3) extensive advertising and promotional efforts; and (4) direct evidence of secondary meaning among the product or service's public. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 816 (1st Cir.1987) ("*Volkswagenwerk*"); *President & Trustees of Colby College v. Colby College–New Hampshire*, 508 F.2d 804, 807 (1st Cir.1975). Here, plaintiff has presented evidence which demonstrates: its long and exclusive use of the mark THE DAILY CATCH from the year 1973 to the present; that it has engaged in extensive advertising and promotional activities over the years in the Boston area under the name

THE DAILY CATCH, particularly since the opening of the third DAILY CATCH restaurant in Cambridge; that its business has been extremely successful, growing from a small restaurant/cafe to an operation of three-to-four restaurants which offer more services to a larger clientele; and that through favorable restaurant reviews by the media and its advertising, THE DAILY CATCH has become known to the restaurant-going public in the Boston area for its seafood and calamari dishes.

Accordingly, the Court concludes that although plaintiff is unlikely to prevail on any claim of an exclusive right to the use of the word CATCH,[11] it is likely to succeed at trial in establishing an exclusive right to the use of the three-word mark THE DAILY CATCH in connection with its restaurant services.

### 2. Likelihood of Confusion

■ The key element in any infringement action is likelihood of confusion. *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 559 (1st Cir.1982). Under First Circuit case law, this Court must look to eight factors is assessing the likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trades; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the mark; and (8) the strength of the mark. *Volkswagenwerk,* 814 F.2d at 817; *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486–87 (1st Cir.1981) (*"Pignons"*). No one factor is determinative, but each must be considered. *Id.* The Court will address each of the factors in the order named as applied to the facts of this case.

### a. Similarity of the Marks.

Similarity of the marks is determined on the basis of the total effect of the designation, rather than a comparison of individual features. *Volkswagenwerk,* 814 F.2d at 817. Marks may be recognized as similar based on sight, sound and meaning. *Id.* Similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the "circumstances surrounding the purchase of the goods" or services. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir.1980). Although similarity is measured by the marks as entities, similarities weigh more heavily than differences. *Id.*

Here, both parties use three-word marks which begin with the word "The," end with the word "Catch," and contain a two-syllable modifying term in the middle of the mark. The marks have the same sound and cadence. *Cf. Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 926 (10th Cir.1986) (*"Beer Nuts"*) ("Brew Nuts" and "Beer Nuts" were held to be similar marks in part because the words "Brew" and "Beer," although "not identical, . . . have a similar sound"); *Schmidt v. Honeysweet Hams, Inc.,* 656 F.Supp. 92, 96 (N.D.Ga. 1986) (the marks "Honey Baked Ham" and "Honeysweet Ham" were considered similar based on the fact that they were the same in "sound and cadence"). In addition, the dominant word in the marks is the term "Catch," which is used in both marks to mean seafood.

On the other hand, there are some differences between the two marks. The middle, less dominant terms are different words which have different meanings, despite their similarity in cadence. There also are some differences in the styles of script used by the restaurants over their entrances. Moreover, THE VILLAGE CATCH eliminates the word "The" and uses a scallop shell, as opposed to a squid, design over its entrance. The Court concludes, how-

---

**11.** Plaintiff did not obtain registration for the term CATCH alone, and insufficient evidence was presented to show that the word by itself has acquired a secondary meaning and is associated in consumers' minds with plaintiff's restaurants. *Contrast Trump v. Caesars World, Inc.,* 645 F.Supp. 1015, 1019–21 (D.N.J.1986), *aff'd mem.,* 819 F.2d 1135 (3d Cir.1987) (Caesars World showed "The Palace," a registered trademark owned by it, was associated by the public with Caesars and casinos).

ever, that these differences are not so distinctive that they outweigh the strong "phonetic and semantic similarities" between the marks. *Cf. Beer Nuts*, 805 F.2d at 926.

b. Similarity of Goods or Services.

THE VILLAGE CATCH and THE DAILY CATCH provide similar, and in some cases identical, goods and services. Both are exclusively seafood restaurants which serve calamari or squid dishes, as well as various kinds of grilled or broiled fish.

Defendants argue that the menus of the two restaurants are not at all alike. (Docket 46, pg. 15). Specifically, defendants claim that THE DAILY CATCH is exclusively a Sicilian-style restaurant offering primarily shellfish and calamari, with a single token "broiled fish of the day" entree, whereas THE VILLAGE CATCH does not hold itself out as a Sicilian-style restaurant, but rather has a broad seafood menu similar to most other seafood restaurants in Boston. (*Id.*, pg. 18).

There certainly are some differences in the menus of the two restaurants. The most prominent difference is THE DAILY CATCH's specialty of black pasta and THE VILLAGE CATCH's offering of mesquite-grilled seafood. However, the similarities are overwhelming. Jacobs' effort to downplay his restaurant's calamari dishes is undercut by his own advertisement proclaiming himself the "king of calamari." THE VILLAGE CATCH serves 14 of THE DAILY CATCH's 18 core menu items, including Sicilian dishes like "Littlenecks Siciliano," "Sicilian Style Mussels," "Calamari and Linguine (red or white sauce)," "Vongole Neapolitan," "Mussels Marinara," "Monkfish Marsala," and "Lobster Fra Diavolo." Indeed, the similarity between the two restaurants' menus has been noted on numerous occasions by the Boston-area media. According to the 1988 Zagat Boston Restaurant Survey, both restaurants are classified under the same categories as seafood and southern Italian restaurants.

Moreover, THE VILLAGE CATCH is very similar to the first two DAILY CATCH restaurants in both interior and exterior decor. THE VILLAGE CATCH is similar in size and has the same storefront exterior as these restaurants. Like the North End DAILY CATCH, the restaurant also has checkered cafe curtains hanging only in the lower half of the windows. Inside, the atmosphere is similarly informal with the same open-view kitchen, blackboard menu, and ceiling rack with hanging pots and pans.

Like the first two DAILY CATCH restaurants, THE VILLAGE CATCH also uses frying pans for serving meals to patrons. As the media commented, both restaurants take a "cooking-as-entertainment" approach to service. Defendants argue that these similarities in decor are not unique to THE VILLAGE CATCH or THE DAILY CATCH restaurants, and are not a sufficient basis standing alone for relief by plaintiff under the Lanham Act. (Docket 46, pgs. 11–12, 19–20). However, even assuming this is true, these marketplace similarities surrounding the purchase of the parties' services are evidence that defendants have not sufficiently distinguished their mark from that of plaintiff to avoid the likelihood of confusion.

c. The Relationship Between the Parties' Channels of Trade;

d. The Relationship Between the Parties' Advertising;

e. The Classes of Prospective Purchasers.

THE VILLAGE CATCH and THE DAILY CATCH serve the same geographic Boston-area market. THE VILLAGE CATCH is located in Brookline, whereas DAILY CATCH restaurants are located in Boston and Cambridge. Based on the affidavits submitted by various patrons of the restaurants, and the evidence of specific instances of confusion reported by other restaurant patrons who reside in outlying suburban communities, the Court concludes that these three communities fall within the same geographic Boston-area market. Specifically, the evidence shows that residents of Brookline, Cambridge and Boston have crossed their urban boundaries to pa-

tronize *both* the various DAILY CATCH restaurants and THE VILLAGE CATCH. Indeed, the evidence suggests an even broader geographic market as it shows residents from suburban communities, which lie even farther outside the Greater Boston area, have travelled to Cambridge, Brookline and Boston to eat at both plaintiff's and defendants' restaurants.

With respect to the relationship between the parties' advertising, THE DAILY CATCH has engaged in extensive advertising and promotional efforts through the Boston-area media since 1973; through these efforts, it has become known in the area for its calamari dishes and other seafood dishes prepared in a Sicilian style. THE VILLAGE CATCH, on the other hand, has engaged in relatively little advertising, although initially it did place a few advertisements in the *Brookline Tab* and the *Boston Phoenix.* One such ad placed in the *Boston Phoenix* stated: "The VILLAGE CATCH's on—*featuring 'King of Calamari'*—Master of Mesquite—Greg—*formerly of the Daily Catch.*" (Emphasis added).

Defendants argue that this advertisement served to distinguish the services of THE VILLAGE CATCH from the services of THE DAILY CATCH. However, the advertisement which points out a similar specialization in calamari dishes is directed at the same class of prospective purchasers as the advertisements of THE DAILY CATCH. Moreover, the statement concerning Jacobs' former association with THE DAILY CATCH does not, as defendants argue, necessarily distinguish the parties' services, but rather establishes a relationship between them, and indicates that THE VILLAGE CATCH offers the same kind of services as THE DAILY CATCH. Indeed, the use of the checkered cafe curtain motif in their business cards and in their advertising buttresses the concern that defendants sought to promote the connection between the two restaurants.

Defendants have not submitted any evidence that "sophisticated consumers" are involved who would exercise greater care in purchasing the parties' services, and

who would thus less likely be confused by the parties' advertising or similarities in services. *Cf. Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1206 (1st Cir.1983) ("*Astra*") ("there is always less likelihood of confusion where goods are expensive and purchased after careful consideration"). Both THE VILLAGE CATCH and THE DAILY CATCH cater to the same class of prospective purchasers—persons who eat at seafood restaurants, particularly people who like calamari. The prices in both restaurants are moderate and not substantially different.

f. Evidence of Actual Confusion.

Plaintiff need not show actual confusion to prevail on its claim of service mark infringement; mere likelihood of confusion is sufficient. *Volkswagenwerk,* 814 F.2d at 818; *see also Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.,* 217 U.S.P.Q. (BNA) 411, 416 (N.D.Cal. 1982). However, evidence of actual confusion in the mind of a relevant person is one of the factors to be considered in making a determination of likelihood of confusion. *Pignons,* 657 F.2d at 487, 490; *see also Astra,* 718 F.2d at 1207. A "relevant" person is one who is involved in the decision to buy. *Astra,* 718 F.2d at 1207. Evidence of actual confusion is "highly persuasive" in proving the existence of its likelihood. *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1277 (S.D.N.Y. 1986); *Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.,* 217 U.S. P.Q. at 416.

Here, plaintiff has shown that a number of instances of actual confusion have occurred since THE VILLAGE CATCH opened in January 1986, and that these instances of confusion have increased dramatically since the opening of the third THE DAILY CATCH restaurant in Cambridge in August 1987. *See* pgs. 1003–1005, *supra.*

g. Defendants' Intent in Adopting the Mark.

Plaintiff argues that based on the uncontroverted evidence of its prior use of the

mark THE DAILY CATCH and defendant Jacobs' former association with THE DAILY CATCH, this Court must draw an inference that defendants adopted the mark THE VILLAGE CATCH with the intent of associating themselves with THE DAILY CATCH. Plaintiff relies on *Beer Nuts*, 805 F.2d at 929, where the court held:

> The inference of intent is especially strong when the parties have had a prior relationship. Such a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill. Beer Nuts' use of its trademark predated by two decades the use of the BREW NUTS trademark. Clover Club distributed BEER NUTS for many years prior to developing BREW NUTS. BEER NUTS is a very successful product. Clover Club cannot deny knowledge of the BEER NUTS trademark and the popularity of the product. Clover Club sells its product in the same markets as Beer Nuts. The names of the products are similar. The packages are similar. Clover Club's advertising agency advised against the use of the BREW NUTS trademark. The combination of these factors makes clear that Clover Club deliberately adopted a mark similar to the BEER NUTS mark.

(Emphasis added) (citation omitted). *See also Sicilia di R. Biebow & Co. v. Cox*, 732 F.2d 417, 432 (5th Cir.1984) ("[w]e think Cox's prior role as a distributor of Sicilia citrus juice provides additional evidence of his intent to trade on the goodwill of Sicilia"); *Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.*, 217 U.S.P.Q. at 414, 417 (where the court found that defendants intended to exploit plaintiff's reputation in part because one of the named defendants had a prior association with plaintiff and thus was "long and fully aware of the design of plaintiffs' logo when he created the Customs House logo").

Here, defendants' intent is suspect. Defendant Jacobs is a former chef of THE DAILY CATCH, who was fully aware of plaintiff's use of the mark THE DAILY CATCH and the success of plaintiff's restaurant business. Based on his prior relationship with plaintiff, Jacobs knew when he opened THE VILLAGE CATCH, the restaurant would be providing services very similar to those provided at the two DAILY CATCH restaurants then in existence. Evidence of intent includes THE VILLAGE CATCH's initial advertising which stressed a similar expertise in calamari dishes and highlighted the storefront exterior and checkered cafe curtains common to both restaurants; similar menu; and similar informal atmosphere and interior decor with the same open-view kitchen, hanging pots and pans, blackboard menu, and meals served in frying pans.

In rebuttal, defendants claim they chose the name THE VILLAGE CATCH only after looking through the phone book for ideas and noticed other restaurant names contained the word CATCH. In light of the fact that Jacobs worked for THE DAILY CATCH for three years, and incorporated The Village Catch, Inc. only three months after resigning from THE DAILY CATCH, it is hard to believe he got the idea of using CATCH from the phonebook. *Contrast Clairol, Inc. v. Cosmair, Inc.*, 592 F.Supp. 811, 816 (S.D.N.Y.1984) (contention that the adoption of SUMMER SUN as a mark for a hair lightener was a deliberate attempt to imitate SUMMER BLONDE had no merit in part because the terms SUMMER and SUN are widely used in the cosmetics industry, and the product is supposed to lighten the hair in the same way the sun does during the summer).

Jacobs also points out that a number of THE VILLAGE CATCH's presently existing conditions and fixtures were present on the property before THE VILLAGE CATCH took possession of it, and that THE VILLAGE CATCH uses a blackboard menu, as do other seafood restaurants, to avoid the cost of printed menus and to allow for flexibility in making changes to the menu. Jacobs states that whenever he was asked by a customer if THE VILLAGE CATCH was affiliated with THE DAILY CATCH, he would "on every occasion" deny any connection between the two restaurants.

Despite the ample evidence of intent, no live testimony was presented by either par-

ty at the hearing on the preliminary injunction motion. Since the parties' marks are not identical and given the evidence of other restaurants and seafood businesses which have used the terms "Daily" and "Catch" in their names, the Court will not make a finding regarding the bad faith of defendants solely on the basis of the documents which have been submitted.

### h. Strength of Plaintiff's Mark.

Based on the evidence of third party usage of the words "Daily" and "Catch" in the names of restaurants and seafood businesses, the Court has concluded that the plaintiff's mark is a "descriptive" mark. (*See* pg. 1008, *supra*). Such a mark is generally considered a weak mark, which is not afforded the broad protection granted to marks "considered suggestive or ... so fanciful that [they have] come to symbolize the source of origin." *Hindu Incense v. Meadows*, 692 F.2d 1048, 1049–50 (6th Cir. 1982). The Court therefore finds that plaintiff's mark is a weak one. *Cf. Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.*, 217 U.S.P.Q. at 415 (the name "Warehouse" in a stylized logo was found to be a weak mark in the context of restaurant services, "the evidence showing that several other restaurants use the name in their logos").

In sum, although plaintiff's mark is not a strong mark, all other factors weigh in plaintiff's favor. Accordingly, based on a balancing of the above-enumerated factors, the Court concludes that plaintiff has presented overwhelming evidence to demonstrate that it is likely to prevail at trial in establishing a likelihood of confusion due to defendants' use of the three-word mark THE VILLAGE CATCH, and thus a violation of § 1125(a) of the Lanham Act.

### B. *Irreparable Injury to Plaintiff*

■ Here, there is no evidence in the record of actual injury to plaintiff's restaurant business in terms of losses in sales or clientele in the time period since defendants opened THE VILLAGE CATCH. Indeed, as defendants point out, the evidence suggests that on the contrary plaintiff's business is thriving and expanding. Moreover, plaintiff itself has suggested that it may have benefited from some of the consumer confusion because there have been patrons of the third DAILY CATCH restaurant who ate at the restaurant believing it to be owned and operated by THE VILLAGE CATCH.[12]

Under First Circuit law, irreparable harm may be shown even in the absence of evidence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim of trademark infringement. *Camel Hair*, 799 F.2d at 14; *Trak Inc. v. Benner Ski KG*, 475 F.Supp. at 1078. *But cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (where the Second Circuit held that insufficient consideration had been given to the factor of irreparable harm by the district court which found such harm solely because it had "determined that the plaintiffs are likely to succeed on the merits given the likelihood of confusion").

In *Camel Hair*, 799 F.2d at 14–15, the First Circuit relied on the following rationale stated by Judge Friendly in *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971), for finding irreparable injury when infringement is demonstrated:

> While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

(Citations omitted).

Defendants argue that this case is distinguishable from *Camel Hair* because plain-

---

12. Plaintiff's counsel pointed this out at the hearing on May 31, 1988.

tiff has not claimed that defendants' restaurant services are of inferior quality. (Docket 46, pg. 29). Indeed, THE VILLAGE CATCH has received excellent reviews in the local media. However, plaintiff is entitled to the protection of its mark from infringing users regardless of the quality of the second user's product or service. *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1279. In *McDonald's Corp. v. McBagel's, Inc., supra,* the court stated: "Even if defendants had achieved superiority, the plaintiff is entitled to prevent them from using its mark, since to conclude otherwise would subject it to the 'risk that the public's perception of his product will suffer' by defendants' suggested comparison." *Id.* "The rights of the owner of a trademark are the protection of his good reputation and the ability to control the use of his mark." *Crab Cooker v. Speciality Restaurants Corp.,* 223 U.S.P.Q. (BNA) 233, 238–39 (C.D.Cal. 1983) (despite the fact that plaintiff's gross sales had not decreased, injunction issued precluding defendants from using plaintiff's mark "The Crab Cooker" where they utilized plaintiff's unique method of broiling fish and a menu and exhibition cooking similar to those used by plaintiff).

Defendants also argue that plaintiff's delay in filing the action and seeking a preliminary injunction indicates that plaintiff is not suffering irreparable harm. (Docket 46, pg. 25). Significant delay in applying for injunctive relief does tend "to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A. v. Citytrust,* 756 F.2d at 276.

Here, plaintiff waited from January 1986 until September 1987, or approximately [21] * months, to file the motion for preliminary injunction. If plaintiff had sought relief based solely on the confusion between the first two DAILY CATCH restaurants and THE VILLAGE CATCH, plaintiff's delay in seeking enforcement of its rights would have militated against a need for drastic speedy action.

However, plaintiff has explained that it did not move for a preliminary injunction until September 1987 because it was not until August 1987, when the third DAILY CATCH restaurant opened in Cambridge, that "a level of consumer confusion far greater than anything plaintiff could reasonably have known from its experience with its two small Boston restaurants" was revealed. (Docket 54, pgs. 18–19). This increased confusion is not surprising since the Fredduras are spending more money to advertise the Cambridge restaurant than they spent in total over the past 13 years to advertise the first two restaurants. Within the first six and a half weeks of the opening of the Cambridge restaurant, over 60 instances of consumer confusion occurred. Plaintiff responded immediately to these significantly increased instances of confusion by filing its motion for preliminary injunction. Therefore, the Court concludes that under the circumstances of this case there was no delay which would justify a finding of no irreparable harm.

### C. *Balancing of the Equities*

■ On a motion for preliminary injunction, the Court must examine whether the injury to the plaintiff outweighs the harm which granting the injunctive relief would inflict on defendants. The harm to plaintiff has been addressed above. (*See* pgs. 1013–1014, *supra*).

Defendants stated at the hearing on May 31, 1988 that they will be harmed if the injunctive relief is granted because they have spent two and a half years building their reputation and name under the mark THE VILLAGE CATCH. However, defendants have engaged in relatively little advertising or promotional efforts over this two and one half year period. When balanced against the fact that plaintiff has engaged in extensive advertising and promotional activities over the past 15 years, the Court concludes that the harm to plaintiff outweighs any harm to defendants.

* A typographical error in the Magistrate's Report miscalculating the period before the preliminary injunction was filed has been corrected here.—D.P.W.

*Cf. A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir.1986) (the district court did not abuse its discretion in concluding that plaintiff's injury outweighed harm to defendant on balancing plaintiff's 13 years of marketing, promotional efforts and distributorship arrangements against defendant's minimal investment and promotional activities); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1279 ("[t]his is not a case where an injunction will unfairly disadvantage a second user who has expended considerable sums to promote his trademark before the first user raised the issue of infringement").

In its motion, plaintiff is merely requesting that defendants be required to use a different name, *not* to stop doing business or to make any other changes regarding their restaurant services. Jacobs testified that his patrons were attracted to his restaurant because of "location, decor, me, seafood." (*See* pg. 1003, *supra*). These factors will still remain under another name. Moreover, defendants do not even have menus that need reprinting. The cost to defendants in complying with this request will involve only the expense of changing the sign over the entrance of the restaurant and defendants' business cards. Accordingly, under the circumstances of this case, the Court finds that the injury to the plaintiff outweighs the harm which granting injunctive relief would inflict on the defendants.

### D. *Public Interest*

Defendants argue that an injunction prohibiting the use of the word CATCH is contrary to the public interest, because it would "hinder the public's ability to describe the whole genus of products offered by the defendant," and "would be contrary to the very essence of American economic traditions of competition and free enterprise." (Docket 46, pg. 32). In support of this argument, defendants cite *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ("*Kellogg*").

However, *Kellogg* is easily distinguishable because in that case the product was found to be unprotected by a valid trademark, whereas here the Court has concluded that plaintiff has demonstrated a likelihood of success in showing that the mark THE DAILY CATCH is protectible. *See A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d at 909. Here, the relevant consideration is the consumers' interest in not being deceived or confused about the products they purchase. *Id.* Preventing consumer confusion is clearly in the public interest. *Schmidt v. Honeysweet Hams, Inc.*, 656 F.Supp. at 97; *cf. Volkswagenwerk*, 814 F.2d at 820 (the purpose of protecting trademarks from infringement is to allow "the public to depend on the constancy of the quality of products it seeks").

## IV. RECOMMENDED RELIEF

Upon balancing the harms to both the plaintiff and defendants, in light of plaintiff's likelihood of eventual success on the merits, the Court RECOMMENDS that plaintiff's motion for preliminary injunction be ALLOWED in part.

Plaintiff specifically requests that the following order be entered:

[I]t is hereby ADJUDGED, ORDERED and DECREED that the defendants ... be, and they hereby are, enjoined from using the terms CATCH, THE CATCH, CATCHES, THE CATCHES, CATCH's and DAILY alone or in combination with other words or symbols or devices as a service mark, trademark, trade name, corporate or other entity name or otherwise to identify, market, advertise, promote, offer to sell, sell or provide restaurant services and from otherwise infringing plaintiff's service marks THE DAILY CATCH and DAILY CATCH. This prohibition shall include use of the phrase "formerly of THE DAILY CATCH."

The Court RECOMMENDS that plaintiff's request be adopted with the following caveats. First, the order should not enjoin the use of the word DAILY since at the hearing on May 31, 1988, plaintiff's counsel

1016

stated that plaintiff is not now pressing its claim for an injunction against such use.

Second, the Court adopts plaintiff's caveat that it "is not attempting to lock up the word 'catch' and prevent competitors from using it to describe restaurant services," but rather "to protect a particular three-word mark THE DAILY CATCH ... against another three-word mark THE VILLAGE CATCH which ... is confusingly similar to plaintiff's mark as applied to restaurant services." (Docket 54, pg. 3). The Court recommends a prohibition against the use of the word CATCH in a two or three word title with a syncopation similar to THE DAILY CATCH or DAILY CATCH.

A recommended order is attached.[13]

---

13. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation and must identify the portion of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).