William E. DONOGHUE, Plaintiff

v.

IBC/USA (PUBLICATIONS), INC. and
IBC/Donoghue, Inc., Defendants.

Civ. A. No. 95–10936–RCL.

United States District Court,
D. Massachusetts.

May 26, 1995.

Michael Arthur Walsh and James S. Shorris, Choate, Hall & Stewart, Boston, MA, for plaintiff.

Steven S. Konowitz, Konowitz & Greenberg, Needham, MA, for defendants.

### MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

The plaintiff seeks a preliminary injunction restraining the defendants from using his name and photograph in connection with their various publications. The court concludes that a preliminary injunction is warranted, but with a scope more limited than that requested by the plaintiff.

#### A. *Findings of Fact.*

The court concludes that it is likely that the following facts will be established at trial.

1. The plaintiff, William E. Donoghue, is a nationally known investment advisor, with expertise in the subject of money market and mutual fund investing. He has been in the business of providing investment advisory services to the general investing public for approximately twenty-two years. The plaintiff has written ten books on the subject of investment advice and is a nationally syndicated financial columnist. Over the past decade, he has appeared frequently on network,

cable and syndicated television shows dealing with financial markets, financial advice, and investments, and, over the past twenty-two years, he has participated in hundreds of seminars and conferences regarding investment strategies.

2. The plaintiff is the sole shareholder and chief executive officer of The Donoghue Group, Inc. and W.E. Donoghue & Co., Inc. Many of the plaintiff's research, marketing, advisory and promotional activities are conducted through The Donoghue Group, Inc., which publishes *Donoghue's MoneyTalk*, a monthly audio cassette investment advisory service, and "Donoghue OnLine," an electronic mutual fund performance database and tracking and analysis service.

3. In 1980, the plaintiff founded a semi-monthly newsletter, entitled *Donoghue's MoneyLetter*. This newsletter contained articles and analysis regarding current issues in the investment area. *Donoghue's Money-Letter* was published by The Donoghue Organization, Inc., a Massachusetts corporation of which the plaintiff was the sole stockholder. During the 1980's, *Donoghue's MoneyLetter* became well-known among consumers and in the financial advisory services industry for its analyses of market trends and its mutual fund recommendations. In 1986, *Donoghue's MoneyLetter* was named the "Best Financial Advisory Newsletter" by the Newsletter Association. By 1989, *Donoghue's MoneyLetter* had more than 17,000 subscribers.

4. Pursuant to a Stock Purchase Agreement dated July 28, 1989, the plaintiff sold his entire interest in The Donoghue Organization, Inc. to the defendant, IBC/USA. At the same time that they entered into the Stock Purchase Agreement, the plaintiff and IBC/USA entered into a Personal Services and Non–Competition Agreement ("Personal Services Agreement").

The Stock Purchase Agreement provided, among other things, that the purchase price for the stock of The Donoghue Organization, Inc. was $2 million. In addition, IBC/USA agreed to pay the plaintiff a bonus of $781,-405.17. The assets of The Donoghue Organization, Inc. were listed as including *Donoghue's MoneyLetter*, Donoghue's Money Market Investor Hotline (Donoghue's 'Best Money Funds'), *Donoghue's Mutual Funds Almanac*, all inventories of previous books, newsletters, ancillary products based on the above products and other assets. The Stock Purchase Agreement also stated:

> The rights to use the name 'William E. Donoghue' and variations thereof have always been the property of Seller [the plaintiff], not the Company [The Donoghue Organization, Inc.], and Buyer's [IBC/USA's] rights to the use of such name are governed by the Personal Services Agreement.

With respect to the right to use the plaintiff's name, the Personal Services Agreement provided, in paragraph 11, in pertinent part, as follows:

> *In consideration of the payment of the amounts provided on Exhibit 11 hereto, IBC/USA shall have the right until July 29, 1994 to use the name William E. Donoghue and variations thereof on or in connection with any and all of the existing products and services of IBC/USA or The Donoghue Organization, Inc. developed hereafter during the term of the Personal Services Agreement;* provided, however, that for products or services developed after the date hereof during the term of this Agreement, IBC/USA shall obtain the approval of the Employee to the use of Employee's name as aforesaid, and Employee agrees that such approval shall not be unreasonably withheld and shall be granted for products and services unless Employee reasonably explains that such products or services would violate clause 8 or would not be consistent with the provisions of Exhibit 12 or of a quality comparable to that of other IBC/USA or affiliated products or services then using Employee's name. *Upon notice given by IBC/USA to Employee on or before July 29, 1993, and whether or not the term of this Agreement is otherwise extended pursuant to clause 2(b), after July 29, 1994 and until July 29, 1999, IBC/USA shall continue to have the right so to use the name William E. Donoghue and variations thereof, as described above, subject to the protocol set forth in Exhibit 12 and provided (i) that Employee will have a right to sit on the*

investment committee and (ii) *that IBC/ USA shall pay or cause to be paid to the Employee royalties at the rate of five percent (5%) of gross revenues actually received, net of refunds and cancellations, from the sale during such period of products or services including such name in the name thereof.*

(Emphasis added.)

Exhibit 11, mentioned above, provided that a total of $1,000 would be paid to the plaintiff during years one to three of the life of the Personal Services Agreement, and that $1,000 would be paid in year four, and another $1,000 in year five. Exhibit 12, also referred to in paragraph 11, provided:

> The parties agree for the duration of this Agreement to confine their endorsements in the area of personal investment management to packaged financial services consistent with The Donoghue Organization, Inc.'s Do–It–Yourself or Do–It–Economically with a professional investment strategy substantially as presently expressed in William E. Donoghue's books and writings except as they may otherwise agree in writing hereafter.

By the Personal Services Agreement, IBC/ USA agreed to retain the plaintiff to perform various duties, including reviewing and analyzing material concerning mutual funds contained in the *MoneyLetter* and other publications published by IBC/USA and its subsidiaries; making various public relations appearances on behalf of IBC/USA, such as radio and television, investment seminars, conferences, workshops, public speaking engagements and print interviews; actively participating in new product development and implementation; participating in investment committee and editorial meetings; consulting editorially through participation in story meetings and copy review; serving IBC/USA's Board of Directors; and contributing a monthly column to be published in *MoneyLetter.* The plaintiff's salary was set at a base of $20,000 in year one, $30,000 in year two, and $40,000 in each year of the term (including extensions) thereafter. The base salary in and after the fourth year was to be increased by a supplement reflecting increases in the Consumer Price Index.

During the first five years of the Personal Services Agreement, the plaintiff was to receive certain incentive bonuses in addition to his base salary.

The Personal Services Agreement was for an initial term of five years. IBC/USA had the right, at its option, to extend the term of the Agreement for an additional period of five years.

5. During the initial term of the Personal Services Agreement, IBC/USA made the payments specified in paragraph 11 and Exhibit 11 as consideration for its right to use the plaintiff's name and variations thereof. During this period, IBC/USA caused the name of The Donoghue Organization, Inc. to be changed to IBC/Donoghue, Inc. The plaintiff did not object to the name change.

6. On July 16, 1993, IBC/USA gave notice to the plaintiff of the exercise of its options under the Personal Services Agreement to (i) extend the term of the Personal Services Agreement for an additional five year period; and (ii) to continue to have the right to use the name William E. Donoghue and variations thereof after July 29, 1994 and until July 29, 1999. By an agreement dated July 21, 1994, the plaintiff and IBC/USA amended the Personal Services Agreement to allow IBC/USA to "continue to have the right to use the name William E. Donoghue and variations thereof on or in connection with the existing products of IBC/USA without payment of the stated 5% royalty until August 31, 1994." The plaintiff consented to extend this period to October 3, 1994.

7. In October of 1994, IBC/USA removed the plaintiff's name from the title of the *MoneyLetter.* IBC/USA continued to use the plaintiff's last name within the *MoneyLetter,* referring, for example, to the "Donoghue Signal."

IBC/USA continues to sell a service called *IBC/Donoghue's Money Fund Average.* IBC/USA also publishes *IBC/Donoghue's Mutual Funds Almanac* and *IBC/Donoghue Money Fund Directory.*

IBC/USA has paid the plaintiff no royalties since October of 1994.

8. In 1995, the defendants have continued to use the plaintiff's name and picture to promote and advertise the *MoneyLetter*. One such promotion was an envelope sent to the general investing public and to the professional investment community in December, 1994, featuring a photograph of the plaintiff purportedly gesturing at mutual fund advertisements placed by five mutual fund companies, and the statement, within quotation marks: "I'm sick and tired of investors getting ripped off by ads like these!" This statement and similar statements on the envelope were neither made nor authorized by the plaintiff. While the plaintiff had used strong language in the past to criticize techniques and motives of financial planners and brokers, he had not previously criticized mutual funds by name in the manner portrayed on the envelope. Inside the envelope was a letter which was purportedly signed by the plaintiff, containing criticism of certain mutual funds and promotion of certain analyses performed by the *MoneyLetter*. The plaintiff did not authorize the letter.

9. The plaintiff received objections from two of the five mutual companies mentioned on the envelope, including a threat of litigation. In addition, the plaintiff was harshly criticized in *Forbes* magazine for the analysis contained in the letter which he had not authored.

10. The defendants sell several products, including publications, which are all designated as a "service of IBC/Donoghue, Inc." Most of the publications do not feature the plaintiff's name in the title.

11. The plaintiff, on an unspecified number of occasions, has failed to attend weekly investment committee meetings and has missed deadlines for submission of feature articles for *MoneyLetter*. He has made disparaging comments about IBC/USA in a wide variety of public venues. He has endorsed, on at least one occasion, a product which was in competition with *MoneyLetter*.

The plaintiff asserts the following claims in his complaint: infringement of the plaintiff's trademark in his name under the Lanham Act, 15 U.S.C. § 1125 (Count I); improper use of the plaintiff's name and photograph, in violation of M.G.L. c. 214, § 3A (Count II);

trademark infringement under Massachusetts common law (Count III); breach of contract (Count IV); and violation of M.G.L. c. 93A (Count V).

## B. *Rulings of Law*

■ A district court may grant a preliminary injunction if the plaintiff shows (1) a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting the injunction would inflict on the defendant; and (4) that the public interest will not be adversely affected by granting the injunction. *Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989), *quoting Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). "In a trademark case, the key issue is likelihood of success on the merits because the other decisions will flow from that ruling." *Keds Corp.*, 888 F.2d at 220.

### 1. *Likelihood of Success*

On May 11, 1995, the court issued an order in this case, temporarily enjoining the defendants from "distributing to any customer or potential customer any advertising or promotional materials in which William E. Donoghue is represented as criticizing or otherwise commenting on any specific person or entity and any advertising or promotional materials which represent William E. Donoghue as stating things which he did not actually say."

■ In the memorandum explaining the order, the court set forth its understanding of the operation of paragraph 11 of the Personal Services Agreement, governing the defendants' use of the plaintiff's name. The plaintiff argues that the Personal Services Agreement requires royalties for all uses of the plaintiff's name, even if his name is not in a publication's title. The court's reading of paragraph 11 remains unchanged.

Paragraph 11 only requires the IBC/USA to pay the plaintiff royalties for use of the plaintiff's name on revenues received "from the sale ... of products or services including such name *in the name thereof*." (Emphasis

added.) The plain language of this provision does not require the payment of royalties for use of the plaintiff's name in connection with the defendants' products, as long as the plaintiff's name does not appear in "the name" of the products. The plaintiff's argument that it was his understanding that he was entitled to royalties for all uses of his name does not alter the plain meaning of paragraph 11. "As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous." *Massachusetts Mun. Wholesale Elec. Co. v. Danvers,* 411 Mass. 39, 577 N.E.2d 283, 289 (1991), *citing Merrimack Valley Nat'l Bank v. Baird,* 372 Mass. 721, 363 N.E.2d 688 (1977). *See also FDIC v. Singh,* 977 F.2d 18, 24 (1st Cir.1992). Because paragraph 11 is not ambiguous, this court will not consider extrinsic evidence of the parties' understanding.

■ The plaintiff claims that paragraph 11 was changed by an amendment to the Personal Services Agreement, dated July 21, 1994. That amendment allowed IBC/USA to "continue to have the right to use the name William E. Donoghue and variations thereof on or in connection with the existing products of IBC/USA without payment of the stated 5% royalty until August 31, 1994." The plaintiff claims that this amendment implies that the 5% royalty was required to be paid on use of the plaintiff's name even if the name did not appear in the title of the defendants' publications. Otherwise, argues the plaintiff, there would have been no reason to include the phrase "in connection with the existing products." The court does not agree with the plaintiff's analysis. The language of the amendment tracks the language of paragraph 11, which permitted IBC/USA to "use the name William E. Donoghue and variations thereof on or in connection with any and all of the existing products and services of IBC/USA." The amendment's addition, "without payment of the *stated 5% royalty*" clearly refers to the royalty provision of paragraph 11. Rather than change the circumstances giving rise to the right to receive a royalty, the amendment only forgave the payment of royalties which would otherwise have been due under paragraph 11, *i.e.*, royalties flowing from the sale of products in

which the plaintiff's name appears in the name. IBC/USA's right to use the name as before continued. The royalty obligation was suspended for the period stated.

■ The plaintiff has licensed IBC/USA to use his name under the circumstances discussed in paragraph 11 of the Personal Services Agreement. Assuming that the defendants have diverged from the provisions of paragraph 11, the plaintiff would be entitled to prevail on his trademark infringement claim if he could show that the use of his name is protected under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The First Circuit has described a spectrum of "distinctiveness" to be used as a measure for determining whether a particular mark is entitled to trademark protection. *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir.1993). At one end are generic terms. *Id.* In the middle are descriptive terms, which can be protected only if they have acquired a "secondary meaning" by which consumers associate it with a particular producer or source. *Id.* At the far end are suggestive, arbitrary and fanciful terms, known as "inherently distinctive" terms, requiring no proof of secondary meaning. *Id.*

"[S]urnames, when used as trademarks, are inherently indistinctive, i.e., weak. Surnames are permitted trademark protection only upon a showing that they have become strong marks by acquiring distinctiveness through secondary meaning." *R.J. Toomey Co. v. Toomey,* 683 F.Supp. 873, 878 (D.Mass. 1988) (Young, J.).

Secondary meaning "refers to a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source." *Boston Beer,* 9 F.3d at 181, *quoting DeCosta v. Viacom International, Inc.,* 981 F.2d 602, 606 (1st Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993).

Among the factors this court generally looks to in determining whether a term has acquired secondary meaning are: '(1) the length and manner of its use, (2) the na-

ture and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.'

*Boston Beer,* 9 F.3d at 182, *quoting Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 816 (1st Cir.1987).

The court is persuaded that the plaintiff's surname has acquired a secondary meaning vesting it with protected trademark status. The plaintiff has become widely known, due to his efforts during the past twenty-two years, as an expert in mutual and money market funds. The plaintiff's name, through numerous publications and determined self-promotion, has become associated in the public mind with expertise in strategic investment advice.

■ The likelihood of confusion in the public's mind occasioned by an unauthorized use of the plaintiff's name by the defendants is clear. *See Wheeler,* 814 F.2d at 817. If the defendants were to use the plaintiff's name in such a way that suggested that the plaintiff had authorized the connection between the plaintiff's name and certain statements or products, when such was not in fact the case, there would be a high probability of public confusion. Accordingly, any unauthorized use of the plaintiff's name by the defendants would constitute an infringement of the plaintiff's trademark in his name.

The defendants have ceased using the plaintiff's name in the title of the *MoneyLetter.* The defendants, however, have not ceased using the plaintiff's name in the promotion of *MoneyLetter,* and have not ceased using the plaintiff's name in the contents of the *MoneyLetter.* Because paragraph 11 of the Personal Services Agreement authorizes IBC/USA to use the plaintiff's name, and only requires royalties if the name is used "in the name" of a publication, the defendants are not presently required to pay royalties to the plaintiff for their use of his name in connection with the *MoneyLetter.*

■ On the other hand, the defendants continue to use the plaintiff's name in the title of certain other publications, including *IBC/Donoghue's Money Fund Average, IBC/Donoghue's Mutual Funds Almanac* and *IBC/Donoghue Money Fund Directory.* The fact that the plaintiff's name is now part of the corporate name of the entity that was sold to IBC/USA does not permit the defendants to escape the Personal Services Agreement's requirement of the payment of royalties for use of the plaintiff's name in the title of the defendants' publications. The plaintiff is thus likely to prevail in establishing that the use of his name in the titles of these publications without the payment of compensation constitutes unauthorized use in contravention of paragraph 11.

■ In addition, use of the plaintiff's name in a manner which is inconsistent with Exhibit 12 to the Personal Services Agreement would also constitute an infringing use of the plaintiff's name. Exhibit 12 provides that there must be consistency with the ideas "substantially as presently expressed in William E. Donoghue's books and writings...." The court finds that the plaintiff will likely prevail at trial in establishing that the envelope which put words in the plaintiff's mouth targeting specific mutual funds is inconsistent with Exhibit 12. The plaintiff will also likely prevail in showing that any other representations put in the mouth of the plaintiff which are inconsistent with the plaintiff's views, as expressed in his own books and writings, would constitute a prohibited use.

■ The court also concludes that the plaintiff is likely to prevail on his claim that the defendants' use of the plaintiff's name and picture is contrary to M.G.L. c. 214, § 3A. That section provides:

Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof ...

The Supreme Judicial Court of Massachusetts has stated that "the interest which is protected by G.L. c. 214, § 3A, is the interest in not having the commercial value of one's name, portrait or picture appropriated to the

benefit of another." *Tropeano v. The Atlantic Monthly Co.*, 379 Mass. 745, 400 N.E.2d 847, 850 (1980).

While the plaintiff previously authorized the defendants' use of his picture, it is clear that he does not do so now. Similarly, while the plaintiff at one time authorized the defendants' use of his name in the title of the defendants' publications without the payment of royalties, he now no longer does so. The plaintiff has thus made a showing that he will more likely than not succeed on the claimed violation of M.G.L. c. 214, § 3A.

■ The defendants argue that the plaintiff is barred from obtaining injunctive relief because of his supposed "unclean hands." The defendants claim that the plaintiff has failed to comply with his obligations under the Personal Services Agreement, and that he has competed with the defendants in violation of that agreement. The court rejects the notion that the plaintiff is not entitled to a preliminary injunction because his hands are "unclean." This court has wide discretion in deciding whether to bar recovery due to a plaintiff's supposed "unclean hands." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir.1989). While the plaintiff may have failed to comply with all of the terms of the Personal Services Agreement, the defendants were not free to stop paying royalties. In a case similar in some respects to this one, the Third Circuit rejected the defendant's position that it could stop paying royalties and continue to use the plaintiff's name, because he thought that the plaintiff had violated the applicable contract. *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 376 (3rd Cir.1992). The court stated:

> Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits. ... Continued use of the trademark under these circum-

stances amounts to infringement under the Lanham Act.

*Id.* (Emphasis in the original.) In addition, the defendants have not shown a likelihood of prevailing on their claim of "fraud, unconscionability, or bad faith on the part of the plaintiff"—which are elements of an "unclean hands" defense. *Id.* at 377 n. 7.

■ Furthermore, in a trademark infringement action, the court must show solicitude for the public in evaluating an unclean hands defense. The unclean hands doctrine should not be used to justify the continued confusion of the public with respect to the origin of goods and services. *See Bell v. StreetWise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir.1985) (Breyer and Coffin, JJ., concurring).

For the above reasons, the court concludes that the plaintiff is likely to prevail on the merits of his Lanham Act claim and of his claim that the defendants violated M.G.L. c. 214, § 3A.

### 2. *Irreparable Harm*

■ In a trademark infringement case, irreparable harm may be based on the plaintiff's demonstration of a likelihood of success on the merits, even in the absence of evidence of a showing of actual injury. *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1013 (D.Mass.1988) (Woodlock, J.). *See Camel Hair and Cashmere v. Associated Dry Goods*, 799 F.2d 6, 14–15 (1st Cir.1986).

Here, in addition to the presumption of irreparable harm, the plaintiff has shown that his reputation has been harmed by at least some of the defendants' conduct. He has been threatened with a lawsuit as a result of the attacks on mutual funds falsely attributed to him. And he has been scathingly criticized for such attacks in *Forbes* magazine.

### 3. *Balance of Harms*

The balance of harms tilts toward relief for the plaintiff.

The defendants must either (1) pay the plaintiff the royalties they owe for the use of his name in titles of their publications or (2)

refrain from using his name in the title of the publications. In addition, the defendants must refrain from attributing to the plaintiff disparaging remarks which he did not make. In essence, the defendants are only required to comply with their contract.

### 4. *Public Interest*

It is surely in the public interest to avoid misleading or unauthorized use of a trademark. "Preventing consumer confusion is clearly in the public interest." *Calamari Fisheries*, 698 F.Supp. at 1015.

For the above reasons, it is OR-DERED that the defendants:

1. refrain from distributing to any customer or potential customer or anyone else any advertising or promotional materials or any other material in which William E. Donoghue is represented as criticizing or otherwise commenting on any specific person or entity and any other material which represents William E. Donoghue as stating things which are inconsistent with his views as stated in his previously published material.

2. refrain from distributing to any customer or potential customer or anyone else material which contains William E. Donoghue's photograph, portrait or likeness, without the plaintiff's express prior written consent.

3. refrain from distributing to any customer or potential customer or anyone else any material in which the name "William E. Donoghue" or any variation thereof appears in the title of the material, unless the defendants pay the plaintiff royalties pursuant to paragraph 11 of the Personal Sales Agreement.

So ordered.