William E. DONOGHUE,
Plaintiff–Appellant,

v.

IBC USA (PUBLICATIONS), INC.,
et al., Defendants–Appellees.

No. 95–1677.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1995.

Decided Nov. 28, 1995.

Michael Arthur Walsh, with whom James S. Shorris and Choate, Hall & Stewart, Boston, MA, were on brief for appellant.

Steven S. Konowitz, with whom Konowitz & Greenberg, Needham, MA, was on brief for appellees.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and KEETON,* District Judge.

* Of the District of Massachusetts, sitting by designation.

**208**

KEETON, District Judge.

This is an appeal by William E. Donoghue ("Donoghue"), Plaintiff–Appellant, from a Preliminary Injunction of limited scope. Donoghue asserts that the district court erred in its interpretation of contract documents executed by the parties and asks this court to expand relief to, or nearer to, the full scope he requested in the district court. We conclude that if the district court committed any error of law, the error was harmless in relation to the issues before us in this appeal. Also, we conclude that the district court did not abuse its discretion in fashioning the limited scope of the Preliminary Injunction entered. We therefore affirm the district court's order.

To avoid uncertainty that might otherwise exist about the effect of the district court's order (and our affirmance) on further proceedings in this case, we explicitly state the bases of our affirmance and explicitly note certain conclusions of the district court upon which we do *not* rely. These conclusions relate to issues that are at least potentially mixed-legal-factual issues that would be more appropriately decided, both in the district court and on appeal, after the parties have had a full opportunity for discovery and development of evidence bearing upon the factual elements of the legal-factual mix. They are open to *de novo* consideration in the district court during further proceedings there, as well as on appeal.

## I. Background Facts

### A. Before July 1989

Donoghue is an investment adviser well-known as an expert on money markets and mutual funds. Acting individually and through a number of corporate entities, he has marketed advice for more than twenty years in books, newsletters, columns, on-line services, and public appearances. One of his business entities was The Donoghue Organization, Inc., a Massachusetts corporation of which Donoghue was the sole stockholder. Its flagship publication was *Donoghue's MoneyLetter*—a semi-monthly newsletter introduced by Donoghue in 1980. In 1986, *Donoghue's MoneyLetter* was voted "Best

Financial Advisory Newsletter" by the Newsletter Association.

### B. Documents Dated July 28, 1989

Simultaneously, two documents were executed. Though signed by Donoghue in September 1989, these agreements were made "as of" July 28, 1989. They were called the Stock Purchase Agreement ("SPA") and the Personal Services and Non–Competition Agreement ("PSA").

The Stock Purchase Agreement was signed by Donoghue as sole shareholder of The Donoghue Organization, Inc. and Mary Ann Bonomo as Vice President of IBC USA (Publications), Inc. ("IBC USA"). Under the terms of the SPA, Defendant–Appellant IBC USA purchased all 10,000 shares of Common Stock of The Donoghue Organization, Inc. from Donoghue for $2,000,000.

The Personal Services and Non–Competition Agreement was also signed by Donoghue and Mary Ann Bonomo. Under the terms of the PSA, Donoghue became a part-time employee of IBC USA, agreeing to devote approximately one-third of his professional time to editorial, promotional, and other activities mainly involving the *MoneyLetter* publication. The initial term of the PSA was set at five years, with one five-year extension available at the option of IBC USA.

A central subject of dispute in this litigation is the scope and extent of the right of IBC USA and its new wholly owned subsidiary, IBC/Donoghue, Inc., also a Defendant–Appellee, to use Donoghue's name. The contractual rights of the Defendants–Appellees are controlled by the SPA and the PSA.

A provision of the SPA declares:

The rights to use the name "William E. Donoghue" and variations thereof have always been the property of the Seller [Donoghue], not the Company [The Donoghue Organization, Inc.], and Buyer's [IBC USA's] rights to the use of such name are governed by the Personal Services Agreement.

SPA cl. 3(m).

The PSA elaborates on the rights to use the name "William E. Donoghue" stated

above in the SPA. The relevant PSA provision appeared as one long paragraph, reproduced here with bracketed insertions and spacing that we have inserted to aid reading.

*Use of Employee's Name.* In consideration of the payment of the amounts provided on Exhibit 11 hereto [royalty payments of $1,000 per year plus a cost-of-living adjustment in years 4 and 5], IBC/USA shall have the right until July 29, 1994 to use the name William E. Donoghue and variations thereof on or in connection with any and all of the existing products and services of IBC/USA or The Donoghue Organization, Inc.

now bearing that name

and any other products and services of IBC/USA or The Donoghue Organization, Inc. developed hereafter during the term of the Personal Services Agreement;

provided, however, that for products or services developed after the date hereof during the term of this Agreement, IBC/USA shall obtain the approval of the Employee to the use of the Employee's name as aforesaid, and Employee agrees that such approval shall not be unreasonably withheld and shall be granted for products and services unless Employee reasonably explains that such products or services would violate clause 8 [the non-competition clause] or would not be consistent with the provisions of Exhibit 12 [Donoghue's written investment philosophy] or of a quality comparable to that of other IBC/USA or affiliated products or services then using Employee's name.

Upon notice given by IBC/USA to Employee on or before July 29, 1993, and whether or not the term of this Agreement is otherwise extended pursuant to clause 2(b) [the five year extension option of IBC USA], after July 29, 1994 and until July 29, 1999, IBC/USA shall continue to have the right so to use the name William E. Donoghue and variations thereof, as described above, subject to the protocol set forth in Exhibit 12

and provided (i) that employee will have a right to sit on the investment committee and (ii) that IBC/USA shall pay or cause to be paid to the Employee royalties at the rate of five percent (5%) of gross revenues actually received, net of refunds and cancellations,

from the sale during such period of products and services including such name in the name thereof.

. . . .

On January 2, 2000 (or January 2, 1995 if IBC/USA fails to exercise the right to continue to use the Donoghue name as provided herein), IBC/USA agrees to assign all of its residual rights, if any, to use the name William E. Donoghue or any variation thereof in any registered or unregistered trademark, to Employee, provided that an agreement for continued use by IBC/USA has not been concluded, but nothing herein shall be deemed to grant any right, title or interest, or any agreement to grant any right, title or interest, to Employee in or to any name or mark (registered or unregistered) or portion thereof not constituting the name William E. Donoghue or a variation thereof.

PSA cl. 11. The dispute between the parties centers primarily upon the interpretation of this clause and relevant statutes.

### C. Developments Before Amendment of the PSA on July 21, 1994

Notwithstanding the currently alleged deficiencies in the clarity and specificity of the SPA and PSA, and in the performance of each party under these agreements, the first five-year term of the PSA passed relatively uneventfully. During this term, IBC USA changed the corporate name of The Donoghue Organization, Inc. to IBC/Donoghue, Inc.; Donoghue contributed articles to *Donoghue's MoneyLetter* and performed various other duties under terms of the PSA.

According to clause 2(b) of the PSA, IBC USA was required to give notice to Donoghue one year before the last day of the term of the PSA if IBC USA wished to exercise its option to extend the term of the PSA for an additional five years. In early July of 1993, before the one-year benchmark of July 28, 1993, IBC USA initiated discussions with Donoghue regarding the possibility of

amending the PSA before extending it for the additional five-year term.

IBC USA proposed to restructure the compensation provisions of the PSA, primarily to eliminate the 5% royalty that would have first begun to accrue when the second five-year term commenced. In return, IBC USA proposed to increase various incentive payments to Donoghue, based on the number of telephone inquiries generated by his columns, appearances, and books. The record is unclear about how this proposal, or negotiations relating to it, proceeded or whether any progress was made toward amending the PSA.

In any event, on July 16, 1993, IBC USA gave formal notice to Donoghue of its desire to exercise its options under clauses 2(b) and 11 of the PSA to extend, for an additional five years, to July 29, 1999, the term of (1) Donoghue's employment and (2) the license to use his name.

### D. Amendment of the PSA on July 21, 1994 and the Failure of Negotiations

Negotiations regarding an amendment of the PSA continued as the first five-year term was coming to a close. On July 21, 1994, just before the end of the initial five-year term of the PSA, the parties executed a modification of the agreement. This modification extended for one month the time period in which IBC USA could use Donoghue's name without paying the 5% royalty:

> IBC/USA will continue to have the right to use the name William E. Donoghue and variations thereof on or in connection with the existing products of IBC/USA without payment of the stated 5% royalty until August 31, 1994.

App. at 00062. In return for this concession, IBC USA allowed Donoghue to send his employees to IBC USA's weekly *Donoghue's MoneyLetter* Investment Committee meetings during the month of August, 1994.

This interim provision delaying the time when the 5% royalty payments would begin to accrue was itself modified, with Donoghue's consent. The commencing date when royalty payments would begin was moved to October 31, 1994. Negotiations regarding a permanent amendment to the PSA, however, were unsuccessful. The parties never agreed to any further amendment of the PSA.

As the final interim extension was about to end in October, 1994, Defendants–Appellees removed Donoghue's surname from *Donoghue's MoneyLetter*, making the new title simply *MoneyLetter*. The name of the corporate subsidiary remained IBC/Donoghue, Inc., however, and *MoneyLetter* continued to contain references to Donoghue and his name within the text of the newsletter. For example, one section of the newsletter was devoted to the "Donoghue Signal," a statistical measure of market performance. Also, *MoneyLetter* was labeled as "a service of IBC/Donoghue, Inc." on the bottom of the first page. William E. Donoghue was listed in the masthead as "Founder & Contributing Editor" of *MoneyLetter*.

Defendants–Appellees now no longer publish anything with the name "William E. Donoghue" appearing in the name of the publication, but they do market publications in which the corporate name IBC/Donoghue is used within the title. Examples are *IBC/Donoghue's Money Fund Average, IBC/Donoghue's Mutual Funds Almanac,* and *IBC/Donoghue's Money Fund Directory.* IBC USA has not paid Donoghue any royalties (under either the $1,000–per–year or the 5% provision) since October of 1994.

### E. Other Developments

The precipitating event for the current civil action, however, was not the use of Donoghue's name in the name or text of any newsletter or the nonpayment of royalties but rather the use of Donoghue's name and likeness in promotional materials advertising *MoneyLetter*.

In December 1994, IBC USA sent a direct mail advertisement for *MoneyLetter* to the general investing public and the professional investment community. The envelope in which this mailing was sent featured a photograph of Donoghue purportedly gesturing at advertisements of five large mutual fund companies. Above the photograph was a statement in large type and in quotation marks: "I'm sick and tired of investors getting ripped-off by ads like these!" There

were similar statements in smaller type below the photograph and on the back of the envelope. The district court found that Donoghue had neither made nor authorized any of the statements on the envelope. *Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947, 951 (D.Mass.1995).

The district court also found that, "[w]hile [Donoghue] had used strong language in the past to criticize techniques and motives of financial planners and brokers, he had not previously criticized mutual funds by name in the manner portrayed on the envelope." *Id.* Inside the envelope was a letter, purportedly signed by Donoghue, that further criticized the advertisements of such mutual fund companies as Value Line, Fidelity Investments, Dreyfus Corporation, Berger Associates, Inc., and Scudder, Stevens & Clark, Inc. The district court found that Donoghue had not authorized this letter. *Id.*

Donoghue received two written complaints regarding the direct mail advertisement— from Berger Associates, Inc. and Scudder, Stevens & Clark, Inc. App. at 00304–09. Moreover, Value Line threatened litigation against Donoghue and has since filed an action in federal court for the Southern District of New York against IBC USA and IBC/Donoghue, Inc. claiming that it has been injured by the "explicitly false," "deceptive," and "misleading" statements in the direct mail campaign. App. at 00319.

A *Forbes* magazine columnist's comment, published under the date April 24, 1995, publicly criticized Donoghue for the statements attributed to him in this *MoneyLetter* promotional mailing and for continued promotion of the "Donoghue Signal" by touting hypothetical results that would have been achieved had an investor used the "Donoghue Signal" over a period commencing in 1980, even though the "Donoghue Signal" was first introduced in 1988. The columnist observed that use of such "back-tested" results was inconsistent with the published views of Donoghue himself.

Approximately two weeks after the publication of the *Forbes* piece, on May 8, 1995, Donoghue commenced this civil action, claiming infringement of the trademark in his name under the Lanham Act, 15 U.S.C.

§ 1125 (Count I); improper use of his name and photograph in violation of Mass.Gen.L. ch. 214, § 3A (Count II); trademark infringement under the common law (Count III); breach of contract, including the obligation to pay royalties (Count IV); and violation of Mass.Gen.L. ch. 93A (Count V).

## II. The District Court Decision of Donoghue's Motion for Preliminary Injunction

Based upon counts I and II, Donoghue filed on May 8, 1995, along with his complaint, a motion for a temporary restraining order and a preliminary injunction. Donoghue asked the court to enjoin the Defendants–Appellees from distributing any newsletter, publication or promotional materials:

upon which the name William E. Donoghue or any variation thereof (including but not limited to "Donoghue," the "Donoghue Signal," "IBC/Donoghue" or "IBC/Donoghue, Inc.") appears, or upon which any picture of plaintiff William E. Donoghue appears. . . .

App. at 00073. The only ways in which the Defendants–Appellees would have been able to use Donoghue's name under this requested injunction would have been as a by-line for an article actually written by Donoghue or in the masthead of *MoneyLetter* with the title "Founder & Contributing Editor."

After a hearing on May 10, 1995, the district court entered a temporary restraining order of a more limited scope than Donoghue had requested. On May 26, 1995, after further briefing by the parties, the district court granted Donoghue's motion for a preliminary injunction. The Preliminary Injunction fashioned by the district court, however, like the Temporary Restraining Order that preceded it, was significantly narrower in scope than Donoghue had requested.

Instead of granting a blanket prohibition on the use of Donoghue's name, the district court focused on the alleged harmful actively of the Defendants–Appellees. As a result, the court required only that the Defendants–Appellees:

1. refrain from distributing to any customer or potential customer or anyone else

any advertising or promotional materials or any other material in which William E. Donoghue is represented as criticizing or otherwise commenting on any specific person or entity and any other material which represents William E. Donoghue as stating things which are inconsistent with his views as stated in his previously published material;

2. refrain from distributing to any customer or potential customer or anyone else material which contains William E. Donoghue's photograph, portrait or likeness, without the plaintiff's express prior written consent;

3. refrain from distributing to any customer or potential customer or anyone else any material in which the name "William E. Donoghue" or any variation thereof appears in the title of the material, unless the defendants pay the plaintiff royalties pursuant to [clause] 11 of the Personal Sales [sic] Agreement.

*Donoghue v. IBC/USA (Publications), Inc.,* 886 F.Supp. at 955. In fashioning this Preliminary Injunction, the district court properly considered (1) the likelihood of Donoghue's success on the merits; (2) whether Donoghue would suffer irreparable injury if the injunction were not granted; (3) the injury to Defendants-Appellees from granting the injunction; and (4) whether the public interest would be adversely affected by the injunction. *See Keds Corp. v. Renee Intern. Trading Corp.,* 888 F.2d 215, 220 (1st Cir.1989).

We conclude that the order of the district court was proper in the circumstances of this case. Some of the supporting findings and conclusions of the district court in arriving at this order, however, were possibly erroneous and, in our view, they were prematurely decided, as explained below.

### III. Contract Interpretation Issues

### A. Introduction

██ When a court looks to the words of a document to consider the meaning of those words in the context of the agreement, the search is for manifested meaning, not a privately held belief or intent of one party, not communicated to other parties to the bargain. *See Rose-Derry Corp. v. Proctor & Schwartz, Inc.,* 288 Mass. 332, 193 N.E. 50, 52 (1934). Moreover, if the parties execute two or more documents, with a manifested intent that the documents together express their entire agreement, a court reads the documents together, rather than construing each as if it stood alone. *FDIC v. Singh,* 977 F.2d 18, 21 (1st Cir.1992).

In this case, the initial agreement was expressed in the two documents dated July 28, 1989. By their own terms they manifest an understanding that together they completely express one integrated agreement. For example, clause 2 of the SPA reads:

*Other Agreements.* Simultaneously with the Closing Seller and Buyer shall enter into a Personal Services and Non-Competition Agreement substantially in the form attached as Exhibit 2 (the "Personal Services Agreement").

App. at 00026. Also, as previously noted, clause 3(m) of the SPA explicitly states that the rights to use Donoghue's name are governed by the PSA. Accordingly, we read the two documents together, as we understand the district court to have done as well, when searching for manifested meaning relevant to any existing dispute between the parties.

### B. The District Court's Interpretation of the Royalty Provisions

The statements of the district court explaining its order for entry of the Preliminary Injunction are subject to being interpreted as including several distinct and potentially significant rulings as a matter of law, all made as part of the court's reasoned decision to grant the Preliminary Injunction in the precise terms fashioned.

We discuss these rulings separately as well as together. We have chosen the order in which we discuss them for convenience only; we explicitly do not imply that this order of consideration is compelled by precedent or logic. Indeed, we conclude that the several rulings are interrelated in ways that make it appropriate for a court to consider all of them before deciding any. Our separation of the district court's combined determination into four parts and our designation of those parts as "First Ruling," "Second Ruling,"

"Third Ruling," and "Fourth Ruling" are our formulations made only to facilitate reference.

Moreover, the phrasing of these four rulings is ours, not that of the litigants. We have chosen this phrasing to express what *we* understand to be the *substantive content* of the determinations of the district court, explicit and implicit. Each of the parties to this appeal has chosen somewhat different phrasings, which we find to be ambiguous. Examples include the contrasting statements of the parties about whether the district court ruled that a use of Donoghue's name was: (1) permissible without regard to whether the use would result in a royalty obligation, or (2) permissible only on condition that royalties be paid, or (3) permissible only on condition that the user explicitly acknowledge a royalty obligation (without, however, stating the precise conditions that would determine the fact and the amount of the royalty obligation).

We have chosen this course of stating our reading of the meaning of the district court's rulings, including reasonable inferences about implicit assumptions as well as explicit declarations, because the scope of this court's authority and responsibility is not limited to choosing one or the other of partisan descriptions of the district court's reasoning. We examine that reasoning from the perspective of impartial appellate review, and not through partisan lenses.

**First Ruling.** The district court ruled that the agreement of the parties was unambiguous—not only with respect to the scope and extent of the rights of Defendants–Appellees to use the name of William E. Donoghue but also with respect to the amount of royalties they would have to pay as a result.

**Second Ruling.** The district court ruled that the agreement unambiguously meant that Defendants–Appellees were free to remove Donoghue's name from the name of a product and continue to use Donoghue's name within the text of the product and in materials marketing the product.

**Third Ruling.** The district court ruled that the agreement unambiguously meant that, when exercising their rights under the Second Ruling, Defendants–Appellees would incur no obligation to pay any royalties during the second five-year term.

**Fourth Ruling.** The district court implicitly ruled that the agreement authorized Defendants–Appellees to use Donoghue's name in the corporate title of the wholly-owned subsidiary, IBC/Donoghue, Inc.

In reaching the Second and Third rulings, the district court included, as steps of reasoning, the following interpretation of clause 11 of the PSA:

[Clause] 11 only requires the IBC/USA to pay the plaintiff royalties for use of the plaintiff's name on revenues received "from the sale . . . of products or services including such name *in the name thereof.*" (Emphasis added.) The plain language of this provision does not require the payment of royalties for use of the plaintiff's name in connection with the defendants' products, as long as the plaintiff's name does not appear in "the name" of the products. The plaintiff's argument that it was his understanding that he was entitled to royalties for all uses of his name does not alter the plain meaning of [clause] 11. "As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous." *Massachusetts Mun. Wholesale Elec. Co. v. Danvers*, 411 Mass. 39, 577 N.E.2d 283, 289 (1991), *citing Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 363 N.E.2d 688 (1977). *See also FDIC v. Singh*, 977 F.2d 18, 24 (1st Cir.1992). Because [clause] 11 is not ambiguous, this court will not consider extrinsic evidence of the parties' understanding.

*Donoghue v. IBC/USA (Publications) Inc.*, 886 F.Supp. 947, 951–52 (D.Mass.1995).

Donoghue contended that this interpretation was in conflict with both the PSA and the interim amendment to the PSA executed July 21, 1994. In the next paragraph of its Memorandum, however, the district court rejected the contention that the July 21, 1994 amendment was inconsistent with the court's reading of the agreement.

The plaintiff claims that [clause] 11 was changed by an amendment to the Personal Services Agreement, dated July 21, 1994.

214

That amendment allowed IBC/USA to "continue to have the right to use the name William E. Donoghue and variations thereof on or in connection with the existing products of IBC/USA without payment of the stated 5% royalty until August 31, 1994." The plaintiff claims that this amendment implies that the 5% royalty was required to be paid on use of the plaintiff's name even if the name did not appear in the title of the defendants' publications. Otherwise, argues the plaintiff, there would have been no reason to include the phrase "in connection with the existing products." The court does not agree with the plaintiff's analysis. The language of the amendment tracks the language of [clause] 11, which permitted IBC/USA to "use the name William E. Donoghue and variations thereof on or in connection with any and all of the existing products and services of IBC/USA." The amendment's addition, "without payment of the *stated 5% royalty*" clearly refers to the royalty provision of [clause] 11. Rather than change the circumstances giving rise to the right to receive a royalty, the amendment only forgave the payment of royalties which would otherwise have been due under paragraph 11, *i.e.*, royalties flowing from the sale of products in which the plaintiff's name appears in the name. IBC/USA's right to use the name as before continued. The royalty obligation was suspended for the period stated.

*Id.* at 952 (emphasis in original). Because IBC USA had removed Donoghue's name from the title of *MoneyLetter*, the district court concluded that Donoghue was not entitled to any royalties even though his name was being used in the text of *MoneyLetter* through reference to such things as the "Donoghue Signal."

On the other hand, the district court also concluded that the use of the corporate name IBC/Donoghue in the title of various publications (*IBC/Donoghue's Money Fund Average, IBC/Donoghue's Mutual Funds Almanac* and *IBC/Donoghue Money Fund Directory* ) was an invalid use of Donoghue's name under the PSA *unless royalties were paid.* This "unless" clause implies that the district court made what we have designated as its

Fourth Ruling—Defendants–Appellees were authorized by the agreement to use Donoghue's name in the corporate title of the wholly-owned subsidiary, IBC/Donoghue, Inc. Were this not so, the court would have needed to determine the appropriate measure of damages for breach of an obligation not to use Donoghue's name in a corporate title rather than declaring, as it did in the passage quoted immediately below, that Defendants–Appellees could not escape the obligation (or "requirement") of paying royalties if they used Donoghue's name in this way and other conditions for a royalty obligation were satisfied:

The fact that the plaintiff's name is now part of the corporate name of the entity that was sold to IBC/USA does not permit the defendants to escape the Personal Services Agreement's requirement of the payment of royalties for use of the plaintiff's name in the title of the defendants' publications. The plaintiff is thus likely to prevail in establishing that the use of his name in the titles of these publications without the payment of compensation constitutes unauthorized use in contravention of [clause] 11.

*Id.* at 953.

## C. Procedures for Resolving Disputes Over the Meaning of an Agreement

How is a court to proceed when confronted with disputes between parties about the meaning of an agreement they made? Does it matter that all parties assert that the agreement is unambiguous, even though they seek very different rulings about what the agreement unambiguously means?

In our description of an appropriate procedure for working out an answer to these questions in this case, we need not and do not purport to decide that the method we describe here is appropriate for all cases. We do determine that this method is appropriate for our review of the four rulings of the district court we have identified above.

In reaching its First, Second, and Third rulings, the district court excluded all consideration of extrinsic evidence. In support of this decision, the court cited "the parol evi-

dence rule" as described in the following maxim. "As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous." *Donoghue v. IBC/USA (Publications) Inc.,* 886 F.Supp. at 952 (*quoting Massachusetts Mun. Wholesale Elec. Co. v. Danvers,* 411 Mass. 39, 577 N.E.2d 283, 289 (1991)). Although the maxim is acceptable as a statement of "general principle," proceeding on the assumption that no exception applies to the case at hand may lead to error, as the case now before us illustrates.

■ One exception to the general principle is that a court may consider parol and extrinsic evidence for the very purpose of deciding whether the documentary expression of the contract is ambiguous. As this court has said once before:

> In determining *whether an ambiguity exists,* as a matter of law, the [trier] may consider parol and extrinsic evidence. If the [trier] determines that the contract in question contains no ambiguity, then no extrinsic or parol evidence is [to be considered by] the trier of fact. . . .

*Boston Edison Co. v. F.E.R.C.,* 856 F.2d 361, 367 n. 3 (1st Cir.1988) (*quoting Sunstream Jet Express, Inc. v. Int'l Air Service Co.,* 734 F.2d 1258, 1268 (7th Cir.1984)) (emphasis added).

■ A second exception to the general principle flows from the recognition that ambiguity is not an all-or-nothing characteristic of any set of words and phrases. An agreement may be ambiguous in one respect and clear in another. The legal consequences that flow from a determination of ambiguity in one respect do not automatically apply to a dispute over another matter as to which the agreement is clear.

■ In other words, a party claiming to benefit from clarity of an agreement in relation to one kind of potential dispute about meaning must show that there is an actual dispute between the parties about the meaning of the agreement as to which the asserted clear provision is relevant. Clarity about some hypothetical issue not in dispute is irrelevant. Conversely, a party claiming to benefit from ambiguity (for example, by being allowed to proffer extrinsic evidence supporting its interpretation) must show ambiguity in the meaning of the agreement with respect to the very issue in dispute. Demonstration of ambiguity in some respect not material to any existing dispute serves no useful purpose.

■ Because ambiguity in relation to some hypothetical dispute that has not arisen as an existing controversy is immaterial, a court's determination regarding any ambiguity that will make a difference in outcome must be made with sensitivity to what are the existing genuine disputes between the parties (real and not merely hypothetical controversies). Only by having this understanding can a court begin to consider with precision and particularity the alternative meanings proposed by the disputing parties.

■ Thus, if either or both of the parties proposes that extrinsic evidence should be received and considered by the court or by the finder of facts (the jury in a jury trial or the judge as finder of facts in a nonjury proceeding), concrete proffers of the proposed extrinsic evidence are important aids to the court's performing its function of determining both whether there is a *material* ambiguity in the language of the agreement and whether, for that reason or for some other reason, extrinsic evidence is admissible and sufficient to present a genuine dispute to be resolved by a finder of facts. It will sometimes be virtually impossible for a court to determine with confidence whether a contract is ambiguous in a material respect or whether extrinsic evidence should be admitted unless the court first knows what is the proffered extrinsic evidence, and what is the alleged ambiguity it allegedly addresses.

■ Although, at first glance, a court's proceeding in this way may seem to subvert the "general principle" and the parol evidence rule itself, closer examination discloses that proceeding in this way facilitates decisions consistent with the principle, the rule itself, and their underlying policy foundations. A key point is that courts consider contentions regarding ambiguity or lack of ambiguity not in the abstract and not in relation to hypothetical disputes that a vivid

imagination may conceive but instead in relation to concrete disputes about the meaning of an agreement as applied to an existing controversy. Often the existing controversy arises from a turn of events that was not foreseen and addressed by the parties in their negotiations.

When invoking a standard of materiality of any demonstrated ambiguity and reviewing proffered extrinsic evidence to determine whether that standard of materiality has been met, a court is proceeding in a way compatible both with Massachusetts law and with the views of distinguished commentators on the law of contracts. The Supreme Judicial Court of Massachusetts has held that "[a contract] is to be read in the light of the circumstances of its execution, which may enable the court to see that its words are really ambiguous." *Robert Indus. v. Spence*, 362 Mass. 751, 291 N.E.2d 407, 409 (1973). In another case, the Supreme Judicial Court affirmed the judgment of a trial court, observing that "[t]he judge quite properly heard evidence to aid in the construction of the agreement, even before he decided whether the agreement was ambiguous." *Cullinet Software, Inc. v. McCormack & Dodge Corp.*, 400 Mass. 775, 511 N.E.2d 1101, 1102 (1987).

These Massachusetts decisions comport with the views of Professors Corbin and Farnsworth. "The writing can not prove its own completeness and accuracy.... The evidence that the [parol evidence] rule seems to exclude must sometimes be heard and weighed before it can be excluded by the rule." Arthur L. Corbin, *Corbin on Contracts* § 582 at 448–50 (1960), *quoted in,* E. Allan Farnsworth, *Contracts* § 7.3 at 474 (2d ed. 1990).

### D. Unresolved Issues Regarding Ambiguity and Potentially Admissible Extrinsic Evidence in This Case.

■ The manifested meaning of the agreement of the parties, as interpreted by the district court in the passages from its Memorandum of Findings of Fact and Conclusions of Law quoted in Part III.B above, satisfied none of the parties to this case. Donoghue had sought to bar the Defendants-

Appellees from using his name at all without permission and payment of the 5% royalty. The Defendants–Appellees, on the other hand, contended that they were licensed to use Donoghue's name freely in any manner they chose, as part of the official name of the wholly-owned corporate subsidiary as well as in publications. They also contended that they would incur royalty obligations only if variations of "William E. Donoghue" (argued as including only "William Donoghue, Bill Donoghue, Will Donoghue, Billy Donoghue, etc." App. at 00683) were used in the title of a publication.

The proffered interpretations of the parties are at polar extremes; the district court's interpretation, though at neither pole, is closer to Donoghue's proposed interpretation.

These possible interpretations do not exhaust the list of plausible possibilities, however. We add one more to illustrate the point, making clear, however, that we are not making any ruling as to the correct interpretation at this time and do not mean our illustrative suggestion to be given any more or different consideration in further proceedings than that given to other plausible interpretations of the documentary manifestations of the agreement of the parties.

The possible interpretation we suggest is that Defendants–Appellees were not free to change only the title of a product and nothing more, then continue to use Donoghue's name as before in the text of the product, or packaging, or promotional materials, and thereby escape the royalty obligation they would have had if Donoghue's name had remained in the title. This possible turn of events was not explicitly addressed in the text of either the SPA or the PSA.

In thinking about whether there was in the transaction as a whole an implicit answer for each turn of events that has occurred, one may consider what most likely would have happened if a negotiator had explicitly called attention to such a possibility during negotiations. For example, suppose a negotiator for the parties now designated as Defendants–Appellees had stated during negotiations that they understood the proposed agreement to

be that they would no longer have any royalty obligation if they just deleted the Donoghue name from the title of the product and continued to use the Donoghue name within the text of the product and in advertising the product. Unless one can reasonably say it is likely this statement of an understanding not previously expressed would have been accepted and negotiations would have proceeded unruffled, the reasoning of the district court about what the parties' agreement in this case unambiguously means is unpersuasive.

Of even greater moment in relation to the existing controversy between the parties in this case is that a reader of the full text of the two documents executed by the parties might reasonably conclude that the parties had not explicitly addressed another possible turn of events that later did occur—that IBC USA would decide to create a wholly-owned subsidiary and use "Donoghue" in its corporate name. Suppose IBC USA, during negotiations, had openly stated that it would interpret the two documents together, as then drafted, to grant it the right to use "Donoghue" in a new corporate entity's name (and to do so without any royalty obligation as long as IBC USA and its subsidiary did not include "Donoghue" in the name of a product). Is it reasonable to believe that such a statement would have been accepted by Donoghue, without incident, so negotiations would then have proceeded unruffled?

We believe that it is more appropriate at this time *not* to determine whether the agreement is ambiguous in any *material* respect, *not* to determine whether or not extrinsic evidence about the manifested meaning may be received, and *not* to make any final resolution of the dispute between the parties about the manifested meaning of the agreement. Those matters are better left to decision after the district court has before it proffers of proposed extrinsic evidence that might be admissible and might bear upon the final decision about meaning in some respect that is material to an existing controversy and not merely to some hypothetical dispute. The district court can then make the decision with the benefit of a precise focus on proffers of extrinsic evidence proposed for admissibil-

ity and consideration. Also, the court will have more assurance that the case is being decided on the merits and in a way consistent with the objectives underlying the parol evidence rule and the general principle regarding use of extrinsic evidence in determining the meaning of an integrated agreement.

Thus, our affirmance of the district court's order does not imply approval of the court's reasoning that the PSA is unambiguous and what it means as to the rights of Defendants–Appellees to use Donoghue's name and as to their obligation to pay royalties (previously designated as Ruling One, Ruling Two, Ruling Three, and Ruling Four). We conclude that the issues regarding the scope of the right to use Donoghue's name and the rights to royalties should not have been decided before the parties had a reasonable opportunity to develop the factual record more fully. We explicitly do *not* make any rulings as to the alleged ambiguity of the contract on any material issue or as to whether extrinsic evidence may appropriately be received. Those decisions must be made, in the first instance, in the district court, after opportunity for the parties to proffer whatever extrinsic evidence they rely upon to support their various contentions.

### IV. Support for the Preliminary Injunction on the Terms Stated

#### A. Conduct Enjoined

█ Notwithstanding our determination that some of the conclusions reached by the district court were premature, we affirm the Preliminary Injunction as entered. We do so because there is ample support elsewhere in the record for the Preliminary Injunction as fashioned by the district court.

The Preliminary Injunction prevents the Defendants–Appellees from (1) distributing materials in which Donoghue is represented as criticizing a specific person or entity or stating things inconsistent with his published views; (2) distributing materials with Donoghue's photograph or likeness without his prior written consent; and (3) using Donoghue's name in the title of a publication unless royalty payments are made. These

prohibitions are not very onerous, and the findings of fact and conclusions of law of the district court, apart from those we have determined to be premature, amply support granting the Preliminary Injunction to the extent allowed.

First, the district court found that Donoghue is a nationally known investment advisor who has a reputation as an expert in mutual and money market funds. As a result, the court concluded that Donoghue's name was worthy of trademark protection under the Lanham Act, 15 U.S.C. § 1125(a). Specifically citing this court's decision in *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175 (1st Cir.1993), the district court concluded that Donoghue's name had acquired "secondary meaning." And, because "[t]he likelihood of confusion in the public's mind occasioned by an unauthorized use of the plaintiff's name by the defendants is clear ... any unauthorized use of the plaintiff's name by the defendants would constitute an infringement of the plaintiff's trademark in his name." *Donoghue v. IBC/USA (Publications) Inc.*, 886 F.Supp. at 953. Thus, Donoghue was likely to prevail on Count I of his complaint.

Second, the district court found that the statements attributed to Donoghue in the December 1994 direct mailing were not consistent with his previous writings and his investment philosophy. *Id.* As there was a specific consistency requirement in Exhibit 12 to the PSA, App. at 00057, such attributed statements were unauthorized. Thus, the district court concluded that Donoghue was likely to prevail on his breach of contract claim (Count IV).

Third, the district court concluded that Donoghue was likely to prevail on his claim that the Defendants–Appellees used his name and photograph in a manner that violated Mass.Gen.L. ch. 214 § 3A (Count II). The section of the statute quoted by the district court reads:

> Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof....

Mass.Gen.L. ch. 214 § 3A. The court found that "[w]hile the plaintiff previously authorized the defendants' use of his picture, it is clear that he does not do so now." *Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. at 954. Thus, Donoghue was likely to prevail on Count II.

Finally, the district court rejected Defendants–Appellees' affirmative defense that Donoghue had "unclean hands." Under the precedent of this circuit, a district court has wide discretion in deciding whether to bar recovery based upon a plaintiff's alleged "unclean hands." *K Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir.1989) (*citing Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 633 (1st Cir.1983), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984)). Given the record before us, we cannot say that the district court's finding regarding Defendants–Appellees' unclean hands defense was clearly erroneous.

Thus, there is ample support in the record for a Preliminary Injunction as entered in this case. Although we have determined that a few of the rulings made by the district court were premature, these rulings, if error either on the merits or because prematurely decided, were only harmless error.

## B. Rejection of Other Injunctive Relief

■ Plaintiff–Appellant Donoghue has appealed the order of the district court because he had requested a more sweeping preliminary injunction than the one granted. We conclude, however, that just as there is ample support in the record for the relief ordered in the Preliminary Injunction, so also are there sound reasons for not ordering relief of greater scope.

Donoghue contends that the Defendants–Appellees are not allowed to use his name even in the text of publications and in promotional materials; his motion for a preliminary injunction requested that the district court so order. App. at 00072–73. Donoghue admits, however, that Defendants–Appellees are permitted to use his name in the title of publications as long as they pay him

the required 5% royalty. He also admits that Defendants–Appellees are permitted to use his name in the text of a publication if his name is also in the title of that publication.

Thus, Donoghue's argument for greater injunctive relief than that granted can be seen as an argument that Defendants–Appellees are not permitted to use his name in the text of a product unless his name appears in the title of that product as well. And because any use of his name in the title of a publication requires a royalty payment, Donoghue is thus arguing that any authorized use of his name in the text of a publication requires a royalty payment. The harm, then, that Donoghue is seeking to prevent by his request for a more sweeping preliminary injunction is primarily, if not entirely, delayed receipt of royalty payments—a kind of harm ordinarily redressed by an award of monetary damages. "But an entitlement to money damages, without more, rarely constitutes an adequate basis for injunctive relief." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 48 F.3d 618, 622 (1st Cir.1995).

We conclude that the district court did not make any error of law or clearly erroneous finding of fact, and did not abuse its discretion in determining that Donoghue has not shown that irreparable harm will result from a failure to enter a preliminary injunction as broad as he seeks. The district court supportably determined that if an entitlement to money damages accrues during the pendency of this litigation, a monetary award at the conclusion of the case will be an adequate remedy.

### V.  Conclusion

For the reasons explained in Parts I–III, we conclude that the record before the district court when it ordered the Preliminary Injunction and now before us is insufficient for us to determine whether the four rulings identified in Part III.B were erroneous as a matter of law. Therefore, we explicitly do not rely on these rulings in reaching our decision. We also determine, however, for the reasons stated in Part IV, that the order for entry of the Preliminary Injunction on the terms stated was adequately supported by other findings and conclusions of the dis-

trict court. That being so, we conclude that the errors of law, if any, in the four rulings identified were harmless in relation to the issues before us in this appeal.

The district court's order for entry of the Preliminary Injunction is

**AFFIRMED.**